GOLDIE McCOLLUM v. STATE.

No. A-8886.   Aug. 16, 1935.
(48 Pac. [2d] 872.)

Geo. L. Hill and Gotcher & Gotcher, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, J. Plaintiff in error, hereinafter called defendant, was convicted of murder in the district court of Pittsburg county and his punishment fixed at death. He was 25 years old, was an inmate of the state penitentiary, being confined on two convictions for robbery with firearms—one from McIntosh county and one from Lincoln county. The deceased, Wilkins, was also an inmate of the penitentiary, having been convicted nine times. The witnesses both for the state and defendant were inmates of the penitentiary except the guards and officials. Defendant admitted stabbing and killing Wilkins and pleaded self-defense.

The facts are about as follows: Defendant and deceased both worked in the prison laundry, though not in the same department. The killing occurred on Sunday afternoon in the open yard. Defendant, with a dirk, dagger, or other sharp weapon, stabbed Wilkins, inflicting a wound from which he died about twelve hours later. It was shown by the state that at the time deceased was stabbed, he was sitting on the bench under the edge of an open shed, with quite a number of prisoners near about. He was talking to a prisoner named Perry, who was sitting facing him. Perry testified some one came up behind deceased; that he saw a motion of the arm, and deceased immediately jumped up, put his hands to his side, and started hastily toward the penitentiary hospital. His testimony is:

"Q. On April 15th, 1934, on Sunday afternoon about two o'clock did you see Tommy Wilkins, now dead? A.

Yes, sir. Q. Where did you see Tommy? A. Sitting on a bench in front of the hospital. Q. And where were you while Tommy was sitting on that bench? A. I was sitting down on my heels in front of him. Q. Facing him? A. Yes, sir. Q. As you were sitting in that position facing Tommy what did you see happen? A. I saw somebody come up behind him pretty close. I didn't pay any attention to who it was. Tommy jumped up and put his hand over, I believe, his left kidney and went from there to the hospital. * * * Q. Well, before this man came up to the back of Tommy Wilkins, Tommy was not stabbed, was he? A. He wasn't, no, sir. Q. And when this man that came up back of him turned and went away, Tommy was stabbed? A. Yes, sir. Q. And stabbed in the back? A. Yes, sir."

Other witnesses identified defendant as the person who stepped up behind and stabbed deceased. James J. Kelly, a prisoner, testified:

"Q. I want you to state to the jury just where you saw Tommy Wilkins just prior to the stabbing? A. I saw him—there was a long bench opposite from where I was standing on—and he was sitting on it. Q. Sitting on the bench? A. Yes, facing me. Q. Facing who? A. Me. Q. Towards you? A. Yes. Q. Was there anybody in front of Tommy Wilkins? A. Yes. Q. What position was that man in? A. Well, he was on the ground, kind of squatted down. * * * Q. Who was he? A. O'Dell Perry. Q. Now, after you saw Wilkins in that position and O'Dell Perry in front of him what did you see happen? A. Well, I saw Goldie walk up behind Wilkins and I saw him make a motion with his arm."

Deceased made a dying declaration saying the wound was inflicted by defendant and that he did not know any reason for his attack. The fatal blow inflicted a wound just over the left kidney, ranged downward, and entirely through the body. It was about two inches wide at the point of entrance, with a small hole at the point of exit.

After striking the fatal blow, defendant withdrew the dagger, wiped it off, stuck it under his coat, and walked away. He was apprehended some three hours later. During this time he made no report of the matter. He had concealed the weapon he used and it was not found. When first asked about the stabbing, he informed the prison officials he had stabbed deceased, because "he was driving me up a crack," but made no claim of self-defense until the day of the trial. Then, in his own behalf, he testified deceased had determined to kill him because he believed defendant had reported him for selling dope and had brought about a "shakedown"; that on the Wednesday preceding the stabbing, deceased sent for a bottle of milk, and defendant saw him pour some of it into a cup and pour another liquid substance in it from a vial; that deceased then gave this to another man in the laundry, who brought it to defendant and asked him to drink it, stating it was good; that he was suspicious, stuck his finger in it, and it burned; that he did not taste it, believing it to be poison. Defendant testified that on the day preceding the stabbing he was in line leading to the mess hall; that deceased and another man were standing near the entrance, and when he got even with them the other man struck him over the head with an iron bar wrapped in cloth, and deceased attempted to kill him with a knife, but he jumped out of line, ran, and escaped; that just prior to the stabbing defendant was exercising in the prison yard and because of fear of deceased he kept near the north wall; that probably an hour and a half before he stabbed deceased, a prisoner, an old man fifty or fifty-five years old, whose name or number he did not know, without solicitation, gave him a knife; and this prisoner informed him he needed a knife; to take it and defend himself; that he was in danger; that he had been watching Wilkins and his friends and heard

a lot of talk that they were going to kill defendant. He detailed the facts of the stabbing as follows: .

"A. Well, and then I walked on down over towards the shed—the south end of the shed. See? That is over towards the Sergeant's office and when I walked down towards the South end of the shed, why, then I walked over towards the North, the same route I went. * * *

"Well, when I walked through the shed and came back going north over towards these gates, why, the first thing I knew this Tommy Wilkins came up—See?—off the bench where he was sitting down like this (indicating) and he came up with a knife and swung at me and the knife that I had between my left arm and the coat of my jumper—and I come up with the knife I had and come out with it like this—like I have got that pencil (indicating) and I struck at him and then I jumped back out of the way and he throwed this knife down that he had and run over towards the hospital. * * *

"Well, I felt it kind of 'thug' against my hand like that (indicating) and I was pretty sure I hit him."

Some parts of his testimony are supported by other prisoners, which presents a conflict; but the jury by its verdict found the issue against defendant. The state presented testimony to rebut this claim by showing that no such difficulty as claimed by defendant took place on the preceding day, and further testimony that about 15 or 20 minutes before defendant stabbed Wilkins he had fatally stabbed another prisoner in almost the same manner; that is, by a dagger wound over the left kidney, the blade of the weapon penetrating through the body and to the skin. The state has made out a case of murder, coldly planned and cruelly executed.

The first contention made is that the court erred in admitting testimony of the killing of another person by de-

fendant a few minutes before the stabbing of deceased. This was first offered by the state in chief; objection was made and the court excluded the testimony, but at the time stated circumstances might arise which would make it admissible in rebuttal. When offered in rebuttal, objection was again made, and the court after some preliminary hearing in the absence of the jury, admitted it. In his instructions the court, in substance, told the jury that evidence had been introduced tending to prove defendant, a short time prior to the stabbing of Wilkins, had committed a similar assault upon another person, and that such testimony was offered only as tending to throw light upon the offense charged and as bearing on the question of self-defense; that it was for the jury to say whether or not it did have such tendency, and unless they did so find, it should not be considered for any purpose, but in any event it could not be considered for any purpose except as tending to throw light on the offense charged; and that even if they should believe defendant committed an assault upon another person, they could not find him guilty of the offense for which he was on trial, unless they believed from the evidence beyond a reasonable doubt he was guilty of such charge. No further request for instructions was made and no exception taken to the instructions given.

The relevancy of evidence is discussed and has had the attention of this court in many cases. The general rule is the state cannot show that an accused person on trial has committed some other independent crime and that he cannot be convicted for one offense by proof that he committed another offense, however persuasive such evidence may be from a moral point of view. This general rule has many exceptions which it is not necessary to enumerate. The particular exception here applicable is stated in numerous

cases and without dissent, that any fact is admissible in evidence which tends to shed light on the intention of a defendant charged with crime, even though it may tend to prove a separate offense. In Cross v. State, 11 Okla. Cr. 117, 143 Pac. 202, this court said:

"Evidence is admissible, in the trial of a criminal cause, which tends directly to prove the guilt of the accused, although it may also show, or tend to show, the commission of a separate and distinct felony, and this is true although the admission of such testimony may arouse resentment in the minds of the jury and result in a greater punishment than would ordinarily be inflicted."

This was reiterated in Ellis v. State, 54 Okla. Cr. 295, 19 Pac. (2d) 972. The following cases are enlightening: Dykes v. State, 11 Okla. Cr. 602, 150 Pac. 84; Hampton v. State, 7 Okla. Cr. 291, 123 Pac. 571, 40 L. R. A. (N. S.) 43; Vickers v. United States, 1 Okla. Cr. 452, 98 Pac. 467. In Williams v. State, 4 Okla. Cr. 523, 114 Pac. 1114, citing numerous authorities in support, it was held:

"Any fact is admissible in evidence which tends to shed light upon the intention of a defendant in the commission of an act for which he is upon trial, even though it may prove a separate and independent crime.

"It is competent in a case of homicide to put in evidence the conduct, actions, and general demeanor of a defendant before the killing, for the purpose of proving that he was armed and in a vicious humor, provided such conduct is so near the time of the homicide that it tends to show the state of mind of the defendant at the time of the killing."

In the instant case, as stated, defendant testified he acted in self-defense in stabbing and killing Wilkins; that the knife with which this was done had been given him by another prisoner for his self-defense. This evidence that

he had stabbed and killed another prisoner a few minutes before was admissible as rebutting his testimony that the knife had been given him by another person to defend himself against Wilkins and that he had the knife for self-defense. It also rebuts the testimony of self-defense, as it shows the conduct, general demeanor, and vicious mind of defendant just prior to the killing of Wilkins and tended to show that defendant was the aggressor. It also has some tendency to identify defendant as the person who stabbed Wilkins, since the two homicides were committed in close proximity, both as to place and time, in a particular manner, and with an unusual weapon.

We have read the testimony closely and have carefully considered the briefs. There is a conflict in the testimony for the state and that for the defendant, but the verdict is sustained by an abundance of evidence and is not against the weight of evidence. We perceive no error of any consequence and are satisfied defendant had a fair trial. The case is affirmed.

The original time for the execution having passed, owing to the pendency of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Pittsburg county be carried out by electrocution of the defendant on the 24th day of October, 1935.

DAVENPORT, P. J., and DOYLE, J., concur.