Ethel I. (Blank) THOMPSON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17321.

Court of Criminal Appeals of Oklahoma.

March 13, 1973.

Joe Cannon, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, Ethel I. (Blank) Thompson, hereinafter referred to as defendant, was charged and tried in the District Court of Seminole County, Case No. CR–70–146, for the offense of Murder and found guilty of First Degree Manslaughter. Her punishment was fixed at eighteen (18) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

Defendant had married Morales Franklin (Pete) Thompson, the deceased, in 1965. Jerry Blank, a witness for the State, testified at the trial that he was the nineteen year old adopted son of the defendant.

At the trial, Max Dykes, desk sergeant at the police station in Seminole, Oklahoma, testified that he was on duty at 12:50 a.m. on the 11th day of October, 1970, and that the defendant came into the station and told Officer Dykes that Pete Thompson was shooting up the house and to please get some help because her son was still in the house and she feared that he would be hurt.

Bob Lovelady, a deputy sheriff of Seminole County, was dispatched to the Thompson residence. Upon arriving at the residence, he did not get any response when he knocked on the door. After shining a flashlight in a window and seeing Jerry Blank lying in a bed and seeing a man lying on the floor of the kitchen, the deputy, along with other officers, entered the house and observed the deceased lying on the kitchen floor with a bullet hole in his upper right arm and his right side. The deputy then went into the bedroom where Jerry Blank was and found Blank lying there with his arms outstretched. The deputy said to another officer, "Well, I believe

he's playin' possum," and the officers handcuffed Jerry Blank and read the Miranda warnings to him. Upon further observation of the deceased, the officers found a gun lying beside him.

The medical examiner was called and the doctor pronounced Pete Thompson dead, and his body was removed by ambulance. The medical examiner testified that the bullet wound in Pete Thompson's chest was the cause of death. At the scene, the medical examiner took a blood sample from Jerry Blank and this sample was later testified to as containing .06 per cent by weight of ethyl alcohol and that that amount would show that Jerry Blank was not intoxicated.

The State's proof further showed the location of certain bullets and shell casings that were found around the house. Mr. Ray Lambert, a firearms examiner for the Oklahoma State Bureau of Investigation, testified as to said hulls and bullets and identified State's Exhibit No. 2 as a .22-caliber semi-automatic Mossberg rifle and State's Exhibit No. 12 as a .22-caliber semi-automatic Remington rifle.

The undersheriff of Seminole County, Mr. Douglas Arnold, testified that he found evidence of some fifteen shots being fired in the house. Five bullet holes were found in the kitchen floor and there were bullet holes around a deep freezer located in the kitchen. Around the lock on the door of the freezer, there were powder burns.

Sheriff Arnold further testified that between 4:00 a.m. and 5:00 a.m. of the 11th day of October, 1970, the defendant was taken to the county courthouse and advised to call her lawyer. Defendant called her attorney and talked with him. After the defendant completed her conversation with her attorney, she advised Arnold that she did not need an attorney. Thereupon, Arnold read to the defendant, and had her read along with him, the waiver of her constitutional rights. Defendant then signed the waiver, State's Exhibit No. 9, and signed a written statement to the effect that she did not shoot the deceased, State's Exhibit No. 10. Defendant's attorney was not present when she signed the waiver and written statement. According to Arnold, defendant was not induced to make any statement through coercion or threats with reference to the crime.

Mr. Bill Holt, an agent with the Oklahoma Bureau of Investigation, testified that around noon, October 12, 1970, the defendant was brought to the District Attorney's Office for further questioning. Defendant was again adequately warned of her constitutional rights, but she responded that she did not need an attorney. Defendant further stated that she did not know anything about the death of Pete Thompson, that she had nothing to do with it, and that she did not shoot him. Defendant consented to take a polygraph test. Later on that afternoon, defendant was taken into an adjoining courtroom and was again adequately advised about her Fifth Amendment Constitutional rights. She signed a "Request for Polygraph Examination", State's Exhibit No. 11, but before the test could be administered, the defendant stated that there was no use in taking the examination, that she shot "him" twice. According to Holt, the defendant stated that she got a .22-caliber rifle out from under the bed where Jerry Blank was lying, walked to the door between his bedroom and the kitchen, where the deceased's body was found, and that this is where she was standing at the time she fired. Defendant's attorney was not present at either of these interrogations. According to Holt, defendant was not induced to make any statement through compulsion, prolonged interrogation, or promises or threats with reference to the crime.

Jerry Blank testified that he went to the home of the defendant and the deceased in Seminole, Oklahoma, during the late afternoon of the 10th of October, 1970. He stated that after arriving at the residence, there was target shooting and other handling of the two .22-caliber rifles in the house by the defendant, the deceased, and himself. Blank further testified that he, as well as the defendant and the deceased, drank whiskey from the time of his arrival at the house and that he got dizzy and sick

and went to bed somewhere around 11:00 p.m. He told the investigating officers that he had been asleep and did not know what had happened. According to Jerry Blank, the deceased was a heavy drinker, and liquor caused difficulties between the defendant and the deceased. Blank testified that he had been present when the deceased had abused the defendant because she wouldn't let the deceased have any more liquor. On one occasion he called the police when the deceased was beating on the defendant.

The defendant testified that the deceased committed numerous assaults upon her in the past including breaking her arms, pulling her dress off, beating and bruising her, and crushing her jaw. According to the defendant, the deceased threatened to kill her when he was drinking, and on one occasion snapped a rifle at her, but it was not loaded. On another occasion, the deceased attacked her with a hatchet because she would not give him whiskey.

Testimony of the defendant further showed that she and the deceased had been in Oklahoma City on the 10th of October, 1970, and that the deceased drank quite a bit while in the city; that on the return trip to Seminole, on the same day, the deceased drank more whiskey; and that the deceased bought even more whiskey in Seminole before arriving home. Defendant further testified that she hid the whiskey before she went to bed, that the deceased missed the whiskey, knocked the defendant across the bed, got the Mossberg .22-caliber rifle and tried to shoot the lock off the deep freeze, thinking the whiskey was hidden in it. According to the defendant, Jerry Blank was sitting on the side of his bed in the back bedroom when the deceased said, "I'll kill ya' if you don't get me my whiskey," and then "drew" the rifle on Blank and the defendant. According to the defendant, a struggle took place for a rifle located under Jerry's bed, between the defendant and Jerry Blank. Defendant testified that she did not know whether the gun went off while she and Jerry were scuffling over the gun. Jerry threw the gun down on the bed, defendant grabbed it and ran out of the

back door. She ran next door for help, but could not arouse her neighbors. She jumped in her car and started for the police station. On the way to the station, she saw a pickup behind her and thinking it was the deceased, threw out the rifle. The rifle was later found at this location. She further testified that the first time she knew that her husband was dead was when Deputy Sheriff Arnold told her on the morning after the incident. The defendant denied that she told Mr. Holt that she shot the deceased.

■ The first proposition asserts that the trial court erred in allowing the State to amend the Information at the close of the State's case and over objection of the defendant. The Information, prior to amendment, charged that the defendant killed the deceased with a "pistol." Through interlineation, the Amended Information charged that the defendant killed the deceased with a "rifle." The defendant argues that the amendment is a matter of substance, not form. According to 22 O.S. 1971, § 304:

"An information may be amended in matter of substance or form at any time before the defendant pleads, without leave, and may be amended after plea on order of the court where the same can be done without material prejudice to the right of the defendant; no amendment shall cause any delay of the trial, unless for good cause shown by affidavit."

In Strunk v. State, Okl.Cr., 450 P.2d 216, we cited with approval, Syllabus No. 3 in Cody v. State, Okl.Cr., 376 P.2d 625:

"An information may be amended in matters of either form or substance when it can be done without prejudice to the substantial rights of the accused."

The Information, prior to its amendment, was sufficient to inform the defendant of the charge for which she was to be tried. The Information complied with 22 O.S. 1971, § 401 and 22 O.S.1971, § 402, which set forth the requisites of a sufficient Information. We are of the opinion that the amendment was an amendment as to

form rather than substance and that defendant did not show how she was harmed or prejudiced by said amendment. Hence, this assignment of error is without merit.

The second proposition contends that the court erred in allowing certain confessions of the defendant to be introduced into evidence in violation of her State and United States Constitutional Rights, thereby depriving her of a fair and impartial trial. The defendant argues that the interrogating officers knew that the defendant retained a lawyer, but proceeded to question the defendant, while in custody, without her attorney being present or knowing about the session of questioning. We are of the opinion that the trial court did not err in allowing the confessions of the defendant to be admitted.

■ The testimony elicited that the defendant was given her constitutional rights before each session of questioning. These rights were in accordance with those set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As the record discloses, defendant was warned that anything she might say would be used against her in a court, that she had the right to remain silent, that she had a right to presence of an attorney, and that if she could not afford an attorney, one would be appointed, if she desired. Defendant acknowledged that she understood her rights. At two of the three interrogating sessions, defendant verbally stated that she did not need an attorney. The transcript discloses that the defendant readily and voluntarily, without any coercion, stated that she would talk to the authorities and signed at least two "rights waivers." The transcript discloses that defendant knowingly and intelligently waived the right of counsel at the beginning of each interrogation and that at no time prior to her confession did she indicate a desire to stop answering questions until counsel could be afforded. In Johnson v. State, Okl.Cr., 448 P.2d 266 (1969), cert. den., 90 S.Ct. 953, 397 U.S. 941, 25 L.Ed.2d 121, this Court stated in the first and third paragraphs of the Syllabus:

"1. Any statement given freely and voluntarily without any compelling influence is admissible in evidence.

"3. Volunteered statements of any kind are not barred by the Fifth Amendment, U.S. Constitution, and Art. 2, § 20, Okla. State Const."

The third proposition of the defendant contends that the trial court erred in conducting a private discussion with the foreman of the jury during the deliberations of the jury and that error also occurred when the court conducted discussions with the jury about their deliberations, how they stood, and emphasizing certain instructions. Defendant cites 22 O.S.1971, § 894, as authority:

"After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the county attorney and the defendant or his counsel, or after they have been called."

Defendant also cites Badgwell v. State, Okl.Cr., 418 P.2d 114, wherein the Court stated in the third and fifth paragraphs of the Syllabus:

"3. It will be observed that the language employed by the legislature in the foregoing statutes is not permissive, but mandatory, * * *.

* * * * * *

"5. After the case has been submitted to the jury for their determination, any unauthorized communication of an officer or official of the court or any third person creates a presumption of prejudice against the defendant and this presumption must be overcome by competent evidence presented."

The defendant further cites the case of Graham v. State, Okl.Cr., 121 P.2d 308.

■ This Court has stringently followed the rule under 22 O.S.1971, § 894 and other

related sections of Title 22, and we do not dispute the law of the *Badgwell* and *Graham* cases. Upon a review of the transcript, this Court determines that information between the trial court and the foreman and between the trial court and the jury was made in the presence of all parties concerned, that notice was given to the parties, and that the jury was brought into open court. Hence, the transcript does not support the asserted error that the court conducted improper discussions with the jury about their deliberations or that the trial court conducted a private discussion with the foreman of the jury. We, therefore, find this proposition to be without merit.

██ Defendant's combined fourth and fifth propositions of error are predicated on the theory that the trial court should have granted a new trial because of the sworn testimony of State's witness in chief, Jerry Blank, adopted son of defendant, that he had perjured himself at the trial in that he, Jerry Blank, and not defendant, killed the deceased, as stated in his post-trial affidavit attached to defendant's Motion for New Trial. In Whitworth v. State, Okl. Cr., 158 P.2d 364, this Court held:

> "The Criminal Court of Appeals has many times held that the granting of a new trial by reason of newly discovered evidence is within the sound discretion of the trial court, and that unless this discretion is abused, the judgment will not be set aside. Horn v. State, 13 Okl.Cr. 354, 164 P. 683; Peters v. State, 35 Okl. Cr. 367, 250 P. 1032; Newman v. State, 35 Okl.Cr. 296, 250 P. 554; Vice v. State, 54 Okl.Cr. 405, 22 P.2d 1039; Calloway v. State, 38 Okl.Cr. 418, 262 P. 696."

There is nothing in the entire record to show the trial court violated this time honored rule. Propositions four and five are without merit.

Defendant's sixth and seventh propositions, again combined, assert error by the trial court in giving instructions number six (6), seven (7) and fifteen (15), and we shall deal with them in that order:

██ Instruction number six (6) told the jury "there is no evidence showing or tending to show that the homicide in this case was manslaughter in the second degree, and that degree of homicide will not be defined to you further than to say that it is a certain kind of negligent killing."

The defendant made no request, oral or written, for an instruction on second degree manslaughter, apparently because the evidence does not warrant the giving of such instruction. Defendant's defense, as reflected by the record, was excusable homicide and none other. Counsel for defendant cites no specific authority for second degree manslaughter instruction, and we dispose of the asserted error as being without merit.

██ Instruction number seven (7) was, "There is no evidence showing or tending to show that the homicide in this case was excusable homicide, and that degree of homicide will not be defined to you further than to say that it is a certain kind of accidental killing."

Instruction number fifteen (15) in part told the jury as follows: "In this case, the defendant, in support of her plea of not guilty, claims as a justification of such homicide that she acted in defense of her person." Then the court outlines to the jury the usual standard elements of self-defense.

As heretofore indicated, defendant in testifying in her own defense, did not claim self-defense, she did not testify that she shot the defendant at all; she testified that she and her adopted son were scuffling over a rifle, neither pointing it at deceased, and during the scuffle the rifle discharged; she testified she did not know what caused it to discharge, nor which rifle, the one she and her son struggled over or the one the deceased was firing, inflicted the mortal wound. It is true State's witness Bill Holt testified in chief that the defendant had told him that she shot deceased two times with the rifle, but in her testimony for herself she specifically denied making such statement.

Her defense was not justifiable homicide; she did not claim self-defense. She claimed, and yet asserts, excusable homicide, which is defined by statute in part as follows:

"Homicide is excusable in the following cases:

"1. When committed by accident and misfortune * * * in doing any other lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent." (21 O.S.1971, § 731.)

This, other than the possibility that her son might have unintentionally fired the rifle during the struggle over it, was and is her precise defense and the Court failed to instruct on the same.

The failure to instruct on excusable homicide was error; to instruct on justifiable homicide was likewise error. It is necessary to reverse the judgment and sentence.

Having thus concluded, we deem it unnecessary to deal with the two remaining propositions asserted by defendant.

Accordingly, the case is reversed and remanded.

BRETT and BUSSEY, JJ., concur.