2001 OK CR 25

**Michael Joseph CIPRIANO,**

v.

**STATE of Oklahoma, Appellee.**

No. F–2000–890.

Court of Criminal Appeals of Oklahoma.

Sept. 4, 2001.

Rehearing Denied Oct. 11, 2001.

R. Scott Adams, Oklahoma City, OK, Counsel for Appellant.

Robert Macy, District Attorney, Marc Pate, Elizabeth Sharrock, Assistant District Attorneys, W.A. Drew Edmondson, Attorney General of Oklahoma, David M. Brockman, Assistant Attorney General, Oklahoma City, OK, Counsel for the State.

## OPINION

LUMPKIN, Presiding Judge:

¶ 1 Appellant Michael Joseph Cipriano was tried by jury and convicted of First Degree Murder (21 O.S.1991, § 701.7), Case No. CF–98–4511, in the District Court of Oklahoma County. The jury recommended as punishment life imprisonment without the possibility of parole and the trial court sentenced accordingly. It is from this judgment and sentence that Appellant appeals.

¶ 2 Appellant was convicted of shooting to death fifteen (15) year old Candace Kerschner. On July 17, 1998, the deceased, along with her younger brother and sister, was visiting at her grandparent's home in Edmond. Behind the grandparents' home was a portable building referred to as the "dollhouse." The building contained dolls and toys and was large enough for the grandchildren to play and sleep in when they visited. That afternoon, Mrs. Kerschner, the deceased's grandmother, and her visiting grandchildren, including the deceased, cleaned the carpet in the dollhouse and changed the clothes on the dolls.

¶ 3 Later that evening, the family sat down to watch a movie. The deceased was excited because her boyfriend, Appellant, was coming to see her. When Appellant arrived, he joined the family in watching the movie. At approximately 10:30 p.m., the movie ended and the deceased's grandfather told everyone it was time for bed and that Appellant should be going home. The deceased told her grandmother she wanted to walk Appellant

out by herself because she wanted to kiss him. The deceased also told her grandmother she was going to the dollhouse to finish recording a CD and it would probably take her fifteen minutes. Mrs. Kerschner told the deceased not to take any longer.

¶ 4 Approximately 15 to 20 minutes later, Mrs. Kerschner sent the other grandchildren to the dollhouse to get the deceased. The children came back in the house screaming "Michael beat up on Candace." Mrs. Kerschner ran to the dollhouse and found the deceased lying on her stomach on the daybed. Mrs. Kerschner turned the deceased over and saw marks and blood on her face. She ran back to the main house to call 9–1–1. Before she could return to the dollhouse, a police officer was on the scene. Emergency medical personnel arrived shortly thereafter. The deceased was pronounced dead at the scene.

¶ 5 Investigating officers observed the deceased lying on the floor. She had suffered one gunshot wound to the back of her head. Also observed was an exit wound on her forehead, slightly higher than the entrance wound. No other trauma to the body was found. A pool of blood was found on the east end of the daybed. The blood trickled off the bed and pooled on the floor near the deceased. A dent or deviation was found in the east side railing of the daybed and a bullet fragment lying on the dress of a doll sitting approximately 6 to 8 inches directly in front of the railing. A pillow containing blood and powder burns was found on the floor near the deceased. There were no signs of any struggle in the dollhouse and no signs of any weapons.

¶ 6 Upon leaving the "dollhouse," Appellant rode his bicycle to the home of Michelle Mayfield where his friend, Jason Hulsebus was staying. Hulsebus testified at trial that Appellant acted like he was running from someone. Hulsebus said that he and Appellant went into the bathroom to talk privately. Appellant told Hulsebus "I did it, I did it . . . I shot her." When Hulsebus asked who she was, Appellant replied "[m]y girlfriend." Hulsebus testified that Appellant calmed down enough to tell him that he and the deceased had an argument, that the deceased had a "knife or something like that," and after getting the "knife" away from her, he shot her.

¶ 7 Appellant and Hulsebus left the bathroom intending to tell Mayfield what had happened. Initially, Appellant said he had been in a fight with three guys. Upon hearing sirens, Mayfield pressed for more information. Appellant then told her he had gone over to his girlfriend's house and a fight ensued. Appellant said his girlfriend screamed at him, and hit and slapped him. He said he told her to stop, but when she refused, he shot her. As he told his story to Mayfield, details changed. At one point, he said he took the gun with him because he might need it for his own protection. At another point, Appellant said he did not initially take the gun with him, but after the argument with the deceased began, he rode home, retrieved his father's gun, and went back and shot the deceased. Appellant also told Mayfield he had put a pillow over the deceased's head so no one would hear the gunshot. Appellant consistently stated he had "messed up" his life.

¶ 8 Mayfield asked Appellant if he wanted to call his father. Appellant said he would rather turn himself into the police. So Mayfield drove Appellant to the police station. Finding no one at the police station, she drove to a nearby pay phone. Appellant asked Mayfield to call the police because he did not know what to say. Mayfield called 9–1–1 and waited with Appellant until the police arrived a few moments later.

¶ 9 Appellant was fifteen (15) years old at the time of the offense. A reverse certification hearing was held on March 2, 1999, and Appellant's motions for certification as a youthful offender or juvenile were denied.

¶ 10 Appellant testified in his own defense at trial. He stated the deceased had called him July 17, 1998, stating that her father wanted to talk with him. Appellant said he was afraid of the deceased's father, and that her father had threatened him in the past. Despite his fear, Appellant said he went to see the deceased, but he took a gun with him. Appellant said he did not see the deceased's father that evening but was continually on

the lookout for him. He explained that he and the deceased went to the dollhouse where an argument ensued. He said the deceased started hitting him and threw a pillow at him. He grabbed the pillow and held it with his left hand. Appellant said the deceased then went to the daybed and pulled out what he thought was a knife, although later he found out it was a piece of glass. Appellant said the deceased came at him with the piece of glass. He said he took out the gun with his right hand, thinking that if she saw the gun she would stop. She didn't stop, but swung at him. When she swung she turned. Appellant pushed her and they both fell. He explained that "somewhere in between the pushing and the fall to the bed" the gun went off. Appellant said he still had hold of the pillow. Appellant said he jumped up, took the piece of glass out of the deceased's hand, and ran out of the door.

¶ 11 Appellant testified he was scared when he left but he did not know that the deceased was hurt or that she had been shot in the back of the head. He testified that at the time, he did not know the gun had fired because his ears were ringing. Appellant testified he rode his bicycle through some alleyways and threw the gun into a trash dumpster behind a restaurant. Despite repeated thorough searches by the investigating officers no gun, knife or glass shard was ever found.

¶ 12 In addition to Appellant's testimony, the defense presented the testimony of Tom Bevel, an expert in bloodstain pattern analysis. Bevel testified that in his opinion the gun was not in contact with the pillow when fired but was from one to three inches away from the pillow. He opined that there would have been a smaller ring of gunpowder residue on the pillow if the gun had been pressed into the pillow while it was fired. Bevel also testified it would have been possible for two individuals to fall to the bed and the gun accidentally discharge. On cross-examination, he testified that the accidental discharge theory was not the only possible explanation for the sequence of events in this case.

¶ 13 In his first assignment of error, Appellant contends the trial court failed to properly instruct the jury. Appellant offered written requested instructions on the lesser included offenses of first degree misdemeanor-manslaughter, i.e., a death caused during the commission of the misdemeanor offense of reckless conduct with a firearm; and second degree manslaughter, i.e., that the death occurred as a result of Appellant's culpable negligence in handling the firearm. Appellant also requested an instruction on the defense of excusable homicide. The trial court rejected these instructions, concluding the theory of first degree manslaughter by use of a dangerous weapon was more appropriate given the evidence presented at trial. Defense counsel objected to the giving of the first degree manslaughter instruction in exclusion of other instructions which he opined more closely followed his theory of defense. The objection was overruled and the court issued instructions on first degree murder and first degree manslaughter. Based upon this record, the issue has properly been preserved for appellate review.

¶ 14 The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court. *Patton v. State*, 973 P.2d 270, 288 (Okl.Cr. 1998), *cert. denied*, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Id.* "[A]ll lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence." *Shrum v. State*, 991 P.2d 1032, 1036 (Okl.Cr.1999).[1] In determining the sufficiency of the evidence to support a lesser offense we look at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. *See Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir.1999). Appellant's statements concerning the homicide are sufficient to warrant a jury instruction only if those state-

---

1. While I disagree with this Court's failure to adhere to precedent in *Shrum*, I accede to its application in this case based upon the doctrine of *stare decises*. *Shrum*, 991 P.2d at 1037–39 (Lumpkin, V.P.J. concurring in result).

ments are supported by other evidence presented at trial. See *Newsted v. Gibson*, 158 F.3d 1085, 1092 (10th Cir.1998) (the Tenth Circuit concluded that when the only evidence supporting the appellant's claim to an instruction on a lesser form of homicide was his own self-serving statements and those statements were contradictory and inconsistent with the other evidence presented at trial, the evidence was insufficient to warrant the jury instruction). With these rules of law in mind, we review Appellant's allegations.

¶ 15 In the first of his several challenges to the instructions, Appellant argues the first degree manslaughter instruction was not supported by the evidence presented by either side and was nothing more than a "red herring". Appellant argues first degree heat of passion manslaughter is meant to apply to situations where the accused and the victim are engaged in some sort of emotional situation. He contends heat of passion manslaughter presumes the shooting was a voluntary, intentional act, not an accidental one. Appellant claims the shooting was an accident, and that any "passion" or fear included in his defense was directed at the deceased's father, not the deceased.

¶ 16 Homicide is manslaughter in the first degree when "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as constitute excusable or justifiable homicide." 21 O.S.1991, § 711(2). "The elements of heat of passion are: 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide." *Charm v. State*, 924 P.2d 754, 760 (Okl.Cr.1996); *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997). The question is whether, in addition to evidence of intent, there was evidence that Appellant killed the deceased with adequate provocation, in a heat of passion, without the design to effect death. *Le v. State*, 947 P.2d 535,

546 (Okl.Cr.1997), *cert. denied*, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

¶ 17 In his defense, Appellant testified that he and the deceased argued. He explained that she screamed at him, swung a pillow at him and threatened him with a weapon. He said he grabbed the pillow from her, and took the gun out intending only to scare her. Appellant said the gun accidentally discharged as a result of him pushing the deceased and the two of them falling to the bed. Appellant said he had the pillow in one hand and the gun in the other hand.

¶ 18 Evidence corroborating Appellant's testimony came from the testimony of Michelle Mayfield. Mayfield testified she saw red scratches on Appellant's face and that Appellant told her he and the deceased had argued and gotten into a fight. Mayfield also testified she had known the deceased to "retaliate" toward people in the past. Additionally, the evidence showed the pillow had a bullet hole in it, and the deceased was shot while laying on the bed. The State also introduced evidence the deceased had told friends, approximately two weeks prior to the murder, Appellant had thrown her on the ground, punched her stomach and face and dragged her on the ground.

¶ 19 This evidence supports the theory that the deceased and Appellant had an altercation, that his "passion" was directed towards the deceased, and that he accidentally shot her, although without having the intent to kill her. Therefore, the trial court properly instructed the jury on first degree manslaughter by means of a dangerous weapon.

¶ 20 Appellant next contends the trial court improperly rejected his requested instruction on misdemeanor-manslaughter while engaged in reckless conduct with a firearm. Appellant asserts this offense most appropriately fits the facts as he testified he pulled the gun out during the argument in an attempt to stop the deceased from attacking him. He argues that taking out a gun during an argument could have been considered reckless conduct. Relying on *Reynolds v. State*, 617 P.2d 1357 (Okl.Cr.1979), he argues that an accidental homicide occurring while the defendant recklessly handles a loaded

firearm is a sufficient predicate for misdemeanor-manslaughter.

¶ 21 Title 21 O.S.1991, § 711.1 provides that homicide is manslaughter in the first degree when perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor. The misdemeanor offense of reckless conduct with a firearm is defined as "an act which creates a situation of unreasonable risk and probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another." 21 O.S. Supp.1995, § 1289.11. *See also Jennings v. State,* 643 P.2d 643, 645, (Okl.Cr.1982); OUJI–CR (2d) 6–44.

¶ 22 Reviewing all of the evidence presented at trial, the evidence showed that Appellant was not merely in the commission of a misdemeanor when he shot the deceased. The evidence showed he either shot with the intent to kill or he shot while in the heat of passion during the argument but without the intent to kill. Absent Appellant's own self-serving testimony there is nothing to support his claim that he pulled the gun out intending only to scare the deceased into stopping the argument. Appellant's request for the instruction could only be upheld if his testimony was considered in isolation. However, that is not the test for determining whether the evidence supports the giving of a particular jury instruction.

¶ 23 In *Reynolds,* relied upon by Appellant, "the appellant engaged in drunken horseplay and fired a pistol into the air . . . The third time he fired the pistol his wife was struck and killed." The appellant admitted holding the gun at the time his wife was shot, but introduced evidence to show that the shooting was accidental. The appellant's testimony was corroborated by testimony from the man who grabbed the appellant's hand as the gun discharged.

¶ 24 This Court held that to determine whether the appellant was engaged in the misdemeanor of reckless conduct of a firearm, by "creating a situation of unreasonable risk and probability of death or great bodily harm to another, and demonstrating a conscious disregard for the safety of another person." quoting 21 O.S.1971, § 1289.11 (re-

codified as 21 O.S. Supp.1995, § 1289.11), the totality of the surrounding circumstances must be considered. 617 P.2d at 1360. This Court held the evidence showed the appellant was recklessly carrying and firing his pistol in proximity to a group of people with whom he had been consuming intoxicating beverages. Such evidence, "show[ed] at least an accidental homicide during the commission of a misdemeanor . . ." *Id.*

¶ 25 In the present case, there is nothing to corroborate Appellant's story that he intended only to scare the deceased with the gun or that the gun discharged accidentally without his knowledge. In fact, Appellant's theory of accidental homicide is inconsistent with the other evidence presented at trial. The bullet hole in the pillow was near the center of the pillow and there were powder burns on the pillow. The State's expert testified the powder burns indicated the weapon was in contact or very near contact with the pillow at the time it was fired. The bed in the "dollhouse" was a daybed with an iron metal frame on the north, east and west sides of the bed. The bed would be approached from the south in order to sit or lay on it. A "deformity" and chipped paint were found on the east side of the metal bed frame and a spent bullet found on a doll directly east of the deformity in the bed frame. The gunshot wound to the deceased was near the center of the back of her head with the exit wound on her forehead close to her scalp. The deceased was initially found lying face down on the bed with one arm folded underneath her. Appellant denied knowledge of the gun firing, but admitted that at that point in time his ears were ringing.

¶ 26 This evidence indicates a deliberate pointing and firing of the gun while the deceased laid chest down on the bed, with her head to the east side of the bed frame. If Appellant and the deceased had fallen onto the bed and the gun fired accidentally as he claimed, the chipped paint and spent bullet would have been found on the northern side of the bed, not the eastern side. Appellant's claim of reckless conduct with a firearm fails to take into account all of the evidence presented at trial. His self-serving statements of accidental homicide are contradictory and

inconsistent with the other evidence presented at trial. Therefore, an instruction on misdemeanor-manslaughter while engaged in reckless conduct with a firearm was properly denied by the trial court.

¶ 27 Further, Appellant finds error in the trial court's failure to instruct the jury on second degree manslaughter while engaged in culpably negligent activity. He asserts such an instruction was warranted based upon his testimony that he took a gun with him when he went to see the deceased not knowing that it was loaded. Appellant argues that "[t]he act of taking a gun and brandishing it during a fight, even with no intention of using it, could be considered a form of negligence so egregious that it rises to the level of criminal negligence." Appellant asserts his claim of an accidental shooting distinguishes his situation from cases where second degree manslaughter instructions were refused.

¶ 28 Title 21 O.S.1991, § 716 provides that manslaughter in the second degree is "[e]very killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree." Culpable negligence is defined in the Uniform Jury Instructions–Criminal (2d) 4–104 as follows:

The term "culpable negligence" refers to the omission to do something which a reasonably careful person would do, or the lack of the usual ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions.

¶ 29 As discussed above, the theory of accidental homicide is not supported by the evidence. Accordingly, the evidence does not support the argument that Appellant was culpably negligent in taking the life of the deceased. Therefore, the trial court properly rejected a second degree manslaughter instruction. See Hunter v. State, 637 P.2d 871, 874 (Okl.Cr.1981); Martley v. State, 519 P.2d 544, 548 (Okl.Cr.1974); Miller v. State, 523 P.2d 1118, 1121 (Okl.Cr.1974).

¶ 30 Finally, Appellant challenges the trial court's failure to give his requested instruction on excusable homicide. Excusable homicide is not a lesser included offense of first degree murder, it is an affirmative defense. For if the jury finds the homicide to be excusable, the defendant is absolved of any criminal liability. It is well established that a defendant is entitled to an instruction on any theory of defense supported by the evidence, as long as that theory is tenable as a matter of law. Kinsey v. State, 798 P.2d 630, 633 (Okl.Cr.1990). Title 21 O.S.1991, § 731 provides that homicide is excusable in the following situations:

1. When committed by accident and misfortune in doing any lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner.

¶ 31 In the present case, an instruction under subsection 1 was not warranted as the undisputed evidence showed the 15 year old Appellant took a gun to the deceased's home. Title 21 O.S.1991, § 1272 makes it unlawful for any person to carry upon his or her person a gun, unless otherwise permitted by law. There is no evidence to suggest Appellant in any way was lawfully carrying the gun that night. See Reynolds v. State, 617 P.2d 1357, 1360 (Okl.Cr.1979); Johnson v. State, 506 P.2d 963, 966 (Okl.Cr.1973) (accidental death, to be wholly excusable, must have resulted from doing of some lawful act).

¶ 32 At trial, the request for an instruction on excusable homicide was denied under subsection 2 as the trial judge found that section precluded the use of a dangerous weapon. Appellant objected to the court's ruling arguing that under the court's reasoning if ever a gun was used in an accidental shooting subsection 2 would never be applicable. Defense counsel argued that such an interpretation of the statute was unconstitutional. Now on appeal, Appellant argues the

trial court's interpretation would result in an irrebuttable and thus unconstitutional presumption. Appellant contends the limitations on situations involving a dangerous weapon were intended by the Legislature only to include those situations where the accused intentionally uses a dangerous weapon against another person. He asserts that the defense of excusable homicide should apply when the death results from an accident, regardless of whether a dangerous weapon was the instrument that actually inflicted the death.

¶ 33 Appellant's argument raises a question of first impression. In our review of § 731, we have been unable to find a challenge to the preclusion of the use of a dangerous weapon as set forth in subsection 2. The challenges to the statute, and particularly subsection 2, have commonly been in the form of arguments that the circumstances of the homicide did not establish "an accident or misfortune."

¶ 34 Under our case law, this Court has held that the use of a gun to commit a homicide, regardless of the defense, precludes the application of subsection 2. *See Lee v. State*, 637 P.2d 879, 885 (Okl.Cr.1981); *Vassaur v. State*, 514 P.2d 673, 685 (Okl.Cr. 1973).[2] Further, this Court has found instructions under subsection 2 warranted only when a weapon or instrument other than a gun was used to commit the homicide. *See Adams v. State*, 93 Okla.Crim. 333, 228 P.2d 195, 197 (1951) (defendant assaulted deceased with his fists, knocked him down and then got on him and beat him to death); *Mead v. State*, 65 Okl.Cr. 86, 83 P.2d 404, 409 (Okl.Cr. 1938) (defendant turned and struck or pushed deceased and deceased fell into the ditch, 11 days later deceased died of a blood clot or embolism); *Johnson v. State*, 59 Okl. Cr. 283, 58 P.2d 156 (1936) (defendant beat deceased with his fists with such force as to knock deceased to the sidewalk, thereby fracturing the skull of the deceased and causing the death of the deceased).

¶ 35 By the plain language of subsection 2, the provision does not apply when a danger-ous weapon is used. This reading of the statute does not preclude a defendant from using the defense of accident whenever a dangerous weapon is used in a homicide. However, the Legislature has narrowly defined when a defendant may claim absolution of criminal responsibility when a gun has been used to commit a homicide. As a result, the Legislature has limited defenses to homicide on the basis of justification, 21 O.S. 1991, § 733 (homicide committed in self-defense, in defense of another, to prevent the commission of a felony, or in defense of a habitation) and excuse, 21 O.S.1991, § 731(1) (homicide is committed by accident and misfortune in doing any lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent). Title 21 O.S. 1991, § 731(2) was clearly intended to address situations where instruments other than dangerous weapons, *i.e.*, guns, were used in the commission of a homicide.

¶ 36 In reviewing 21 O.S.1991, § 731(2), we find it does not create any presumptions which may or may not be rebutted. The statute merely sets forth the affirmative defense of excusable homicide. Contrary to Appellant's argument, the presence of a dangerous weapon is not a presumption of criminal intent. Once a defendant has presented sufficient evidence to raise the defense of excusable homicide, it is the burden of the State to prove beyond a reasonable doubt that the death was not excusable homicide. If the defendant fails to produce sufficient evidence which tends to prove the homicide was excusable, no instruction on excusable homicide shall be given.

¶ 37 Under the law as enacted by the Legislature, and the evidence in this case, the trial court did not abuse its discretion in rejecting the instruction on the defense of excusable homicide. Appellant's uncorroborated statement, and Bevel's conclusion, inconsistent with the rest of the evidence, was insufficient to warrant an instruction on excusable homicide. Appel-

---

2. *Thompson v. State*, 507 P.2d 1271 (Okl.Cr. 1973) relied upon by Appellant was decided under subsection 1 of § 733, and is therefore not applicable in this case. *See also Reynolds v. State*, 617 P.2d 1357, 1360 (Okl.Cr.1979).

lant's defense theory that the shooting was accidental was adequately presented to the jury in the heat of passion manslaughter by a dangerous weapon instruction.

¶ 38 Appellant has not shown that the evidence presented at trial would allow a rational jury to find him guilty of the lesser offenses of misdemeanor-manslaughter or second degree manslaughter and acquit him of first degree murder or first degree manslaughter. Further, he has failed to show sufficient evidence was presented to raise the defense of excusable homicide. Accordingly, we find the trial court did not abuse its discretion in rejecting Appellant's requested jury instructions. This assignment of error is denied.

■ ¶ 39 In his second assignment of error, Appellant contends the trial court erred in excluding evidence of the deceased's father's extensive and violent criminal history. At trial, Appellant offered documentary evidence of David Kerschner's criminal record and argued the evidence was essential to show that Appellant had a valid and reasonable fear of Kerschner and why he armed himself with a gun before going to visit the deceased. The trial court upheld the State's objection and motion *in limine* finding evidence of Kerschner's prior criminal record was not relevant. The trial court stated it would allow the defense to introduce evidence that Appellant was afraid of Kerschner and any threats Kerschner had made toward Appellant. Now on appeal, Appellant argues the evidence was admissible under 12 O.S. 1991, §§ 2404(A)(1) and 2405. Appellant asserts that § 2404(A)(1) permits the accused to present evidence of any person's character, and not just his own character.

■ ¶ 40 Relevant evidence is that which makes a material fact more or less probable than it would be without the evidence. 12 O.S.1991, § 2401. Questions concerning the relevancy of particular evidence are within the discretion of the trial court. *Woodruff v. State,* 846 P.2d 1124, 1137 (Okl. Cr.1993). A determination that the evidence should be excluded as irrelevant should be

affirmed unless there is a clear showing of abuse accompanied by prejudice. *Id.*

¶ 41 Title 12 O.S.1991, § 2404(A) provides:

A. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

1. Evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same;

2. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor; or

3. Evidence of the character of a witness, as provided in Sections 2607, 2608 and 2609 of this Code.

¶ 42 Section A sets forth three exceptions to the general prohibition against the introduction of character evidence. Subsection 1 clearly relates to the character evidence of the accused, and not just any person as argued by Appellant. Reading § 2405 does not further Appellant's argument as it addresses only the methods of proving character. Therefore, under the plain language of § 2404(A), evidence of David Kerschner's prior criminal history was not admissible as he was not the accused, the victim, or a witness.

¶ 43 Appellant further argues evidence of David Kerschner's violent past was relevant and admissible as it shed light on why Appellant armed himself with a gun before going to see the deceased. In support of the argument, Appellant cites case law stating that the defendant's state of mind at the time of the homicide is relevant. *See Phelps v. State,* 64 Okl.Cr. 240, 248, 78 P.2d 1068, 1072 (1938); *McCollum v. State,* 57 Okl.Cr. 381, 48 P.2d 872 (1935).

■ ¶ 44 Evidence of David Kerschner's violent character was not disputed by the State, nor was it disputed that Kerschner was not present that night of the homicide. Appellant testified he was afraid of Kerschner, he had been threatened by Ker-

schner, and that he knew Kerschner had committed acts of violence. Appellant stated the deceased had called him and told him to come over because her father wanted to see him. He further testified it was because of his fear of Kerschner that he took the gun with him that evening. This evidence allowed Appellant to adequately explain his fear of Kerschner and why he took a gun with him that evening. Evidence of the specific nature of Kerschner's violent history was collateral to the issue of Appellant's guilt or innocence and not relevant as it did not have any tendency to make more or less probable the fact that Appellant intended to kill the deceased. Appellant has failed to show any prejudice from the exclusion of the evidence. We find the trial court's ruling was proper, and this assignment of error is denied.

¶ 45 Appellant contends in his third assignment of error the trial court erred in failing to admonish the jury not to consider the matter of parole. The record reflects a note was sent out by the jury during deliberations asking "[i]f we choose life with parole, what is the minimum term served?" The written question from the jury is contained in the record as Court's Exhibit No. 3.

¶ 46 We review only for plain error as this objection is being raised for the first time on appeal. *Simpson v. State*, 876 P.2d 690, 693 (Okl.Cr.1994). The record reflects that the jury was called out of deliberations to discuss parking for the evening and dinner. The trial judge noted the jury "buzzed about the time and they said they had a question. They don't have a verdict. I will cover the cars and then cover the question later on." (Tr. Vol.V., pg.135). The court proceeded to tell the jury they were being allowed to move their cars and then they were to go directly to the jury room to continue deliberations. The record reflects the jury exited the courtroom to move their cars at approximately 6:30 p.m. At 7:00 p.m. the jury returned with a verdict. Nothing more was said about any questions from the jury, nor were any objections raised by the defense.

¶ 47 Title 22 O.S.1991, § 894 provides:

After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called.

¶ 48 This statute has been construed as mandatory only with regard to bringing the jury back into the courtroom, and the determination of whether the jury's request is granted is within the discretion of the trial court. *Smallwood v. State*, 907 P.2d 217, 237 (Okl.Cr.1995), *cert. denied*, 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996). Any failure to follow the provisions of § 894 can be harmless error where on the face of the record no prejudice to the appellant occurred. *Fisher v. State*, 736 P.2d 1003, 1007 (Okl.Cr.1987).

¶ 49 The failure of the trial court to specifically admonish the jury not to consider matters of parole did not prejudice Appellant. This Court has held that while "a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, we also hold there is no requirement for a trial judge to explain the Oklahoma parole process to a jury." *Mayes v. State*, 887 P.2d 1288, 1318 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). "We believe the concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further." *Id.*

¶ 50 In the present case, the jury was informed the instructions contained all of the rules of law needed in deciding the case (Instruction No.1), and that the punishment upon a conviction of first degree murder was either imprisonment for life without parole or imprisonment for life (Instruction No. 17). The instructions given to the jury do not address the parole process. The trial court's apparent refusal to admonish the jury not to consider matters outside the jury instructions was not prejudicial as it would have been merely repetitive of the written instruc-

tions. Finding no indication of prejudice, any error in the court's response to the jury's question was harmless beyond a reasonable doubt. This assignment of error is denied.

¶ 51 In his final assignment of error, Appellant contends his sentence of life imprisonment without the possibility of parole is excessive and cruel and unusual under the circumstances. Appellant points out that he was fifteen (15) years old at the time of the crime, that he had no prior criminal history, he was known by teachers and friends as a respectful, quiet young man, and that in terms of intellectual maturity, he functioned as low as the second grade in some areas.

¶ 52 This Court has repeatedly held that if a sentence is within the statutory guidelines, we will not disturb that sentence unless, under the facts and circumstances of the case, it is so excessive as to shock the conscience of the Court. *Bartell v. State*, 881 P.2d 92, 101 (Okl.Cr.1994). In *Freeman v. State*, 876 P.2d 283, 291 (Okl.Cr.1994) the nineteen (19) year old defendant asked this Court to give great consideration to his young age and lack of prior convictions in determining the appropriateness of his sentence of life without parole. We stated:

> Our review of the appropriateness of Appellant's sentence is guided by well established principles. We must grant substantial deference to the legislature's determination of sentencing limits. It is not for us to substitute our judgment for that of the sentencing court as to the appropriateness of a particular sentence. This Court has consistently held that where the punishment is within the statutory limits, the sentence will not be modified unless under all the facts and circumstances of the case it is so excessive as to shock the conscience of the Court. Appellant's sentence is well within the limits of 21 O.S.1991, § 701.9(A) since life without the possibility of parole is considered an intermediate level of punishment for the offense of First Degree Murder.... We find the evidence warranted the jury's decision to sentence Appellant to life without parole and

therefore, we decline to modify his sentence. (internal citations omitted).
876 P.2d at 291.

¶ 53 In the present case, Appellant was sentenced to life without parole by a jury who listened to the evidence and observed the witnesses as they testified. The jury heard the evidence supporting the State's theory that Appellant intentionally murdered the deceased by shooting her in the back of the head as she lay on the bed using a pillow to muffle the sound of the gunshot. The jury also heard evidence by the defense, specifically from Appellant himself, that the shooting was an accident.

¶ 54 The jury also heard testimony from Appellant's mother that Appellant was diagnosed with a learning disability and as result was periodically tested to determine his level of educational performance. Admitted into evidence as Defense Exhibit 1, the test result summary showed that in certain areas of study Appellant tested at or above his grade in school, *i.e*, calculation and applied problems. While in areas of writing, listening, reading and math, Appellant tested at a level lower than his grade level in school. Appellant's mother testified that she and her husband considered Appellant to be normal and age appropriate in his behavior. She also testified that she was aware that a judicial determination had been made previously to treat Appellant as an adult in these criminal proceedings.

¶ 55 Under this evidence, the jury found Appellant acted intentionally, with premeditation and malice aforethought, when he shot and killed the deceased. The jury thereby rejected the lesser included offense of heat of passion manslaughter with a dangerous weapon. The jury also concluded the evidence warranted the more severe of the two penalty options. Our review of the record shows Appellant was afforded the protections of the reverse certification process pursuant to 10 O.S.1991, § 7306–1.1, the sentence was properly based in the evidence and supported by the evidence. Therefore, we decline the request for modification of the sentence.[3] Accordingly, this assignment of error is denied.

3. Appellant has also filed a *Motion to Cross–*     *Reference Records* seeking to cross-reference the

## DECISION

¶ 56 The Judgment and Sentence is **AF-FIRMED.**

JOHNSON, V.P.J. and LILE, J., concur.

CHAPEL, J., Dissent.

STRUBHAR, J., Concur in Result.

CHAPEL, Judge, Dissenting:

¶ 1 Barely 15, Michael Cipriano shot and killed his girlfriend, Candice Kerschner, another 15 year old child. Prior to committing this crime, Cipriano had never before been arrested or charged with any crime.

¶ 2 Under Oklahoma law, a child age 15 who commits the crime of First Degree Murder is charged as an adult. After being so charged an accused may file an application to be treated as a child within the juvenile system or as a youthful offender. Cipriano filed both. After a hearing, the trial court denied his motions for certification as a child or youthful offender and he was ordered to stand trial as an adult. Under our statutes such orders are appealable to this Court. Cipriano filed an appeal from the trial court's order and this Court, by the slimmest of margins, a 3 to 2 vote, affirmed the trial court's order.

¶ 3 Thus the stage was set for Cipriano's trial as an adult and resulting life without parole sentence. It is my opinion that the denial of youthful offender status to Cipriano constitutes a violation of his federal constitutional rights under the 5th and 14th Amendments. Moreover, his sentence in my judgment, violates the 8th Amendment to the U.S. Constitution and Article 2, § 9 of the Oklahoma Constitution.

¶ 4 The Youthful Offender Act was adopted by the Oklahoma legislature specifically to apply to children such as Cipriano. He was barely 15 years old when he committed the crime; he is emotionally and psychologically immature; he is learning disabled and functioned several years below his peers; he has strong family support; he had never before been in any kind of legal trouble; and the evidence in support of his motion for youthful offender status was overwhelming and essentially unrebutted. Even the Oklahoma Juvenile Affairs Youthful Offender Study apparently recommended that he be retained in the juvenile system. If this child does not meet the requirements for youthful offender status, no child ever will. Sentencing him to life without parole is quite simply hideous and a travesty of justice.

records from his juvenile certification appeal, Case No. J–1999–345 with those in the pending matter. Appellant argues the records regarding the previously decided Youthful Offender appeal are relevant to this Court's determination of the direct appeal; specifically, the appropriateness of his sentence of life without parole. As the issues contained in the records of Case No. J–1999–345, were not presented to the jury for their consideration in determining Appellant's sentence, we find it is not appropriate for this Court to now review those records in determining the appropriateness of that sentence. Accordingly, the *Motion to Cross–Reference Records* is **DENIED.**