2006 OK CR 45

**Shelton Dewayne JACKSON, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–470.**

Court of Criminal Appeals of Oklahoma.

Nov. 2, 2006.

⌐412.1(4)

Craig Corgan, Mary Bruehl, Emma Rolls, Oklahoma Indigent Defense System, Capital Trial Division, Norman, OK, attorneys for Jackson at trial.

Matthew D. Haire, Oklahoma Indigent Defense System, Capital Trial Division, Norman, OK, attorney for appellant at trial and appeal.

Bill Musseman, Eric Johnston, Julie Doss, Assistant District Attorneys, Tulsa County, Tulsa, OK, attorneys for the State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

JOHNSON, Judge.

¶1 Shelton Dewayne Jackson, Appellant, was tried by jury in the District Court of Tulsa County, Case No. CF–1997–1765, and convicted of Count 1—First Degree Murder in violation of 21 O.S.1991, § 701.7(A), Count 2—First Degree Arson in violation of 21 O.S.Supp.1996, § 1401 and Count 3—Injury to a Minor Child in violation of 10 O.S.Supp.

1996, § 7115. The jury fixed punishment at death for Count 1, 35 years imprisonment and a $25,000.00 fine for Count 2 and life imprisonment and a $5,000.00 fine for Count 3. The district court sentenced him accordingly and he appealed. This Court affirmed his non-capital judgments and sentences, but reversed and remanded his first degree murder conviction for new trial because of ineffective assistance of counsel. *Jackson v. State*, 2001 OK CR 37, 41 P.3d 395.

¶2 Jackson's case was retried March 10–27, 2003 before the Honorable Jesse S. Harris. The jury convicted him of First Degree Murder and fixed punishment at death, after finding that (1) he knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious, or cruel; and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. *See* 21 O.S. 2001, §§ 701.12(2), (4) and (5). The district court sentenced Jackson to death and he appeals.[1]

### I. FACTS

¶3 Jackson had been living with his girlfriend Monica Decator and her two-and-a-half-year-old son, Oz, for several months before he killed her during the early morning hours of April 8, 1997. On April 7th, as was their practice, Jackson took care of Decator's son while she worked a twelve hour shift at a Tulsa hospital. According to Jackson, the child was fussy and crying uncontrollably that morning. Jackson said he lost his patience, picked the child up by the neck, and tossed him to the ground several times. Afterwards the child was quiet for some time. When the child began crying again that afternoon, Jackson pushed him down repeatedly. Following that episode, Jackson said the child could not walk, his eyes were "glazy," and he had so much difficulty breathing that Jackson used a screwdriver to pry the child's mouth open in an effort to help him breathe.

¶4 The timing and sequence of events that followed was disputed at trial. The State

---

1. Jackson's Petition in Error was filed in this Court September 30, 2003. His brief-in-chief was filed November 29, 2004, and the State's answer brief was filed April 19, 2005. A reply brief was filed May 9, 2005. The case was submitted to the Court April 25, 2005. Oral argument was held May 23, 2006.

contended that Jackson put the critically injured child in the crawlspace of a nearby vacant house and covered him with a large piece of carpet so no one could find him. He then went to a nearby Texaco and used Decator's ATM card to empty her bank account. He bought a gallon of gasoline there. That evening he watched wrestling at his uncle's apartment as he regularly did. Afterwards, he returned home and killed Decator so she could not report him for injuring her son. Earlier in the day Jackson provided an explanation for the absence of Decator and her child to his mother. He told her over the telephone that he, Decator, and the boy were leaving town together. He told his uncle the next morning he was going to Louisiana. He actually left town at noon on April 8, 1997.

¶ 5 The account Jackson gave to the police differs from this sequence of events. He told police he did not put the child under the vacant house until after he fought with Decator. He said he had left the child at home in bed when he went to his uncle's house to watch wrestling, and that when Decator returned to the house that evening, she believed her son was with him. Jackson said that Decator discovered her son's injuries when she heard him crying and went to him. That discovery led to a fight that ended when Jackson hit Decator several times in the head with a brick knocking her unconscious. Jackson said it was then he carried the child to the crawlspace of the nearby house. When Jackson returned from that mission, Decator was conscious. She attacked him with a knife. In response, he hit her again with the brick, gained control of the knife and fatally stabbed her.

¶ 6 Decator's body was discovered around 8:30 a.m. on April 8, when firefighters responded to a fire at her home. Fire investigators noted that gasoline had been poured throughout the house and concluded that the fire had been set intentionally. Decator did not sustain any injuries from the fire or smoke; she died as a result of blood loss from various stab wounds and head injuries caused by blunt force trauma. Police found two bloody knives on the floor and a brick with Decator's hair and flesh on it in the backyard.

¶ 7 Police apprehended Jackson later that afternoon when his bus bound for Houston stopped in McAlester. He had no visible injuries. Two Tulsa police detectives went to McAlester and returned Jackson to Tulsa where he made his statement confessing to injuring the child and killing Decator. In McAlester, he gave the detectives the child's general location, but the police could not find him. Later, before making his statement in Tulsa, Jackson gave police specific directions to the location of the critically injured child.

¶ 8 The salient question for the jury during first stage was whether Jackson acted with a deliberate intent to kill Decator, in self-defense, or in the heat of passion when he killed her.

## II. JURY SELECTION ISSUES

¶ 9 In Proposition I, Jackson claims that the district court erred by denying his repeated motions for mistrial and to quash the venire for juror misconduct. When evidence surfaced during jury selection that some prospective jurors had talked about the case and Jackson, the defense moved for a mistrial. The district court denied the motion, electing to question the remaining venire members and excuse for cause any members tainted by exposure to improper conversation. Jackson renewed his motion several times during that process, arguing that the number of jurors involved in or exposed to the improper conversations and information was significant enough to taint the entire jury pool. The district court overruled Jackson's motion each time he renewed it. Jackson asserts that the district court abused its discretion because the court's repeated denial of his motion deprived him of a fair trial.

¶ 10 Jackson maintains that the entire jury pool was infected by the widespread violation of the trial court's instruction not to discuss the case and to report any violation of that instruction. He contends his ability to intelligently exercise peremptory challenges was impaired because most of the *voir dire* regarding juror fitness took place

before evidence of misconduct surfaced.[2] He also contends that the court's questioning was ineffective because it was impossible to tell which prospective jurors were being candid about violating the court's admonition. According to Jackson, the reluctance of jurors to come forward makes it likely that jurors who were either incapable or unwilling to follow the law and the court's instructions decided his fate. The State argues that the trial court's individual *voir dire* and subsequent dismissal of all potential jurors touched by the misconduct cured any error.

¶ 11 This Court reviews a trial court's ruling on a motion for mistrial for an abuse of discretion. *Harris v. State*, 2004 OK CR 1, ¶ 10, 84 P.3d 731, 740. The juror misconduct here was investigated by the trial court to determine if improper communications resulted in any prospective jurors being biased by exposure to extraneous information about the case. Whether a prospective juror is biased depends heavily on the trial court's appraisal of the juror's credibility and demeanor and often the basis for these credibility findings cannot be readily discerned from an appellate record. *Harris*, 2004 OK CR 1, ¶ 11, 84 P.3d at 741. The trial court is in a better position to make decisions regarding juror fitness; hence we have accorded the judgment of the jurist-observer presumptive weight. *Id.* We defer to the trial court's ruling on these issues unless it is clearly erroneous. *See Matthews v. State*, 2002 OK CR 16, ¶ 3, 45 P.3d 907, 912.

¶ 12 The record shows the district court questioned all remaining prospective jurors extensively regarding their exposure to any improper communications about the case or the defendant. None of the twelve jurors seated in the jury box undergoing the final selection process had heard any discussion about the case or the defendant. The district court carefully conducted the individual *voir dire* questioning to avoid tainting the entire venire and pursued every allegation of misconduct. Questions were tailored to elicit whether potential jurors had been exposed to any extraneous information and, if so, whether it affected their ability to be fair and impartial. The district court exercised extreme care to ensure that any prospective juror who was potentially tainted did not infect the venire and did not serve. We are unwilling to find that the number of jurors exposed to improper conversations by itself necessitates a finding that the entire pool was tainted. There is no credible evidence that the measures taken by the district court were insufficient to cure the effects of the juror misconduct or that any juror who would not follow the law was impaneled. The trial court did not err in overruling Jackson's motions for mistrial and to quash the jury pool.

## III. FIRST STAGE ISSUES

¶ 13 In Proposition V, Jackson argues that the trial court erred in overruling his motion to suppress and admitting his statements to the police. We considered this claim in his original appeal[3] and found that the admission of his unwarned statement about the child's location was harmless error. *Jackson*, 2001 OK CR 37, ¶ 9 n. 3, 41 P.3d at 397 n. 3. We also found that his unsolicited statements in the car on the drive back to Tulsa and his statements made after receiving *Miranda* warnings were admissible. *Id.*

¶ 14 Jackson claims that this Court should consider this claim anew because the claim was disposed of in a footnote rather than in the body of the opinion. He maintains that footnotes in opinions have no precedential value and are regarded as dicta. While the Supreme Court has found that some statements contained in particular s are "dicta,"[4] Jackson cites no binding authority from either the Supreme Court or this Court treating all information and holdings contained in s as "dicta." We reject Jackson's request to reconsider this claim simply because it was disposed of in a footnote.

---

2. Information concerning improper communications came to light on the third day of trial after the parties had passed the panel for cause and exercised six peremptory challenges.

3. Jackson concedes in his brief "that many of the arguments below were raised in his prior appeal." Appellant's Brief at 67.

4. *See e.g., Wainwright v. Witt*, 469 U.S. 412, 421, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985).

¶ 15 Jackson also urges us to apply a kind of "clean slate" rule on appeal. His basic contention is that this Court should forego traditional rules of procedural bar and allow him to raise any claims, even if previously asserted, because this appeal involves a separate trial following this Court's reversal of his original murder conviction. He argues that he should be able to raise all errors affecting this conviction and that this Court's prior decision neither addressed nor considered his statements with respect to his successfully appealed murder conviction.

¶ 16 On the contrary, this Court made specific findings that were applicable to the admissibility of the statements that were not related to or dependent upon the specific crimes alleged, *i.e.*, statements in the car were volunteered and not the product of custodial interrogation and Jackson's post-*Miranda* statements were not tainted by his pre-*Miranda* statement. *Jackson*, 2001 OK CR 37, ¶ 9 n. 3, 41 P.3d at 397 n. 3. These findings are controlling. The doctrine of collateral estoppel precludes the relitigation of an ultimate issue by a party or his privies when the issue has been determined by a valid and final judgment.[5] *Smith v. State*, 2002 OK CR 2, ¶ 7, 46 P.3d 136, 137. It is particularly applicable in this case where Jackson did not present any new or different evidence than what was presented in his first trial and appeal. As this Court has previously decided that Jackson's voluntary statements in the car and his statements following *Miranda* warnings were admissible, the current claim is procedurally barred. *See, e.g., Brown v. State*, 1998 OK CR 77, ¶ 10, 989 P.2d 913, 921 (issue decided in extraordinary writ appeal before trial would not be reviewed on direct appeal based on collateral estoppel); *Wilson v. State*, 1998 OK CR 73, ¶ 11, 983 P.2d 448, 456 (same); *Alverson v. State*, 1999 OK CR 21, ¶ 6, 983 P.2d 498, 506 (same); *Humphreys v. State*, 1997 OK CR 59, ¶ 15, 947 P.2d 565, 572 (challenges to evidence ruled admissible on direct appeal by

this Court will not be reconsidered on retrial and any subsequent appeal based on *res judicata* ).

¶ 17 The district court on retrial admitted Jackson's unwarned statement made in McAlester concerning the child's location. We found in Jackson's first appeal that any error stemming from the admission of this statement was harmless. *Jackson*, 2001 OK CR 37, ¶ 9 n. 3, 41 P.3d at 397 n. 3. Because we found that it was error to admit the statement in the first trial, we cannot apply procedural bar and must review this part of Jackson's claim on the merits.

¶ 18 Our review of a ruling on a motion to suppress evidence presents a mixed question of law and fact. When considering a motion to suppress, a trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate witness credibility. We are mindful that as a reviewing court we "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). We therefore accept the factual determinations of the trial court so long as they are supported by competent and credible evidence. Whether the facts meet the appropriate legal standard is a question of law we review *de novo*.

¶ 19 There is no dispute that Jackson was in custody in McAlester and entitled to *Miranda* warnings prior to questioning. Generally, statements made by a suspect during custodial interrogation are inadmissible unless the suspect is first informed of his *Miranda* rights and then voluntarily waives his rights against self-incrimination and to counsel. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The district court, however, admitted

---

5. "To apply collateral estoppel, the following elements must be established: (1) the issue previously decided is identical with the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *Smith*, 2002 OK CR 2, ¶ 9, 46 P.3d at 138.

Jackson's unwarned statement directing police to the child's location under the "public safety exception," which allows police officers, under certain circumstances, to postpone advising a suspect of his *Miranda* rights in order to ask questions necessary to secure their own immediate safety or the public's safety.

¶ 20 The Supreme Court recognized this narrow exception to the *Miranda* rule in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles*, the police were told by a victim that she had just been raped by a man who was carrying a gun and had entered a nearby supermarket. An officer chased the suspect and apprehended him in the back of the store. He was wearing an empty shoulder holster. The officer asked where the gun was, the suspect responded, "the gun is over there," and the officer recovered a loaded pistol. *Id.* at 651–52, 104 S.Ct. at 2629. The officer then formally arrested the suspect and read him the *Miranda* warning. The Supreme Court reversed the state court's decision suppressing the gun and initial statement, concluding that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657, 104 S.Ct. at 2632. The Court declined to make the availability of the public safety exception turn on the subjective motivation of the particular officers involved. *Id.* at 656, 104 S.Ct. at 2631.

¶ 21 In this case, the trial court determined that the facts justified use of the "public safety exception." While we agree that the facts here involve the safety of a small child and satisfy the spirit of the "public safety exception," the focus of the "public safety exception" in *Quarles* was protecting the general public from the defendant rather than rescuing or saving a specific victim of the defendant's actions. To address this particular circumstance, other courts have recognized a "private safety exception" or "rescue doctrine." [6] It applies to situations where exigent circumstances excuse compliance with *Miranda* because of an overriding need to save a human life or to rescue persons whose lives are in danger.[7] The "rescue doctrine" was developed in a pre-*Miranda* decision in *People v. Modesto*, 62 Cal.2d 436, 42 Cal.Rptr. 417, 398 P.2d 753 (1965)(en banc). *See People v. Coffman*, 34 Cal.4th 1, 17 Cal.Rptr.3d 710, 763–65, 96 P.3d 30, 75–76 (2004)(discussing evolution of rescue doctrine). The Modesto court recognized an exception to the usual constraints on custodial interrogation in the situation where an overriding need exists to rescue persons in danger or to protect human life. *Coffman*, 17 Cal.Rptr.3d at 763–65, 96 P.3d at 75–76. The defendant in Modesto was arrested on suspicion of murdering one young girl, whose body had been found, and harming another, who was missing. The California court concluded that the possibility of finding a missing child alive allowed interrogation without advising the suspect of his rights to remain silent and to the assistance of counsel. *Coffman*, 17 Cal.Rptr.3d at 764, 96 P.3d at 75; Modesto, 42 Cal.Rptr. 417, 398 P.2d at 759. Later cases concluded that the Modesto rule remained viable after *Miranda. Coffman*, 17 Cal.Rptr.3d at 764, 96 P.3d at 75. The Modesto rule was discussed and relied on in *People v. Riddle*, 83 Cal.App.3d 563, 574–75, 148 Cal.Rptr. 170, 176 (Cal.Ct.App.1978),

**6.** *See, e.g., People v. Coffman*, 34 Cal.4th 1, 17 Cal.Rptr.3d 710, 763–65, 96 P.3d 30, 56–57 (2004), *cert. denied*, 544 U.S. 1063, 125 S.Ct. 2517, 161 L.Ed.2d 1114 (2005); *State v. Ragsdale*, 276 Wis.2d 52, 687 N.W.2d 785, 789–90 (Wis.Ct.App.2004), *review denied by* 276 Wis.2d 30, 689 N.W.2d 57 (2004); *State v. Betances*, 265 Conn. 493, 828 A.2d 1248, 1256–57 (Conn.2003); *Thomas v. State*, 128 Md.App. 274, 737 A.2d 622, 632 (Md.Ct.App.1999); *Benson v. State*, 698 So.2d 333, 335–37 (Fla.Dist.Ct.App.1997); *State v. Ramirez*, 178 Ariz. 116, 124, 871 P.2d 237, 245 (Ariz.1994); *State v. Provost*, 490 N.W.2d 93, 96–97 (Minn.1992); *United States v. Brady*, 819 F.2d 884, 887–88 (9th Cir.1987); *State v. Kunkel*, 137 Wis.2d 172, 404 N.W.2d 69, 74–76 (1987). The "rescue doctrine" was discussed but not adopted in *People v. Manning*, 672 P.2d 499, 510–12 (Colo.1983)(en banc) because the facts of that case did not qualify.

**7.** The Illinois court stated in *People v. Laliberte*, 246 Ill.App.3d 159, 186 Ill.Dec. 9, 615 N.E.2d 813, 820 (1993), that confusion over these two theories was understandable because both "apply to emergency situations involving the public safety and are, at bottom, almost interchangeable."

holding that *Miranda* did not preclude recognition of a limited exception to the normal rules governing custodial interrogation under exigent circumstances involving a possible threat to human life. "Under circumstances of extreme emergency where the possibility of saving the life of a missing victim exists, noncoercive questions may be asked of a material witness in custody, even though answers to the questions may incriminate the witness." *Riddle*, 83 Cal.App.3d at 578, 148 Cal.Rptr. at 179. The *Riddle* court identified three factors that must exist in order to claim the exception: (1)urgency of need in that no other course of action promises relief; (2) the possibility of saving human life by rescuing a person whose life is in danger; and (3) rescue as the primary purpose and motive of the interrogators. *Id.* at 576, 148 Cal.Rptr. at 177.[8]

¶ 22 We find that the trial court did not err in employing a rescue exception to *Miranda* under the limited circumstances of this case.[9] After discovering Decator's body, police learned that she had a two-and-half-year-old son who was missing. The child was not with Jackson when he was apprehended and the police reasonably feared for the child's safety after finding his mother murdered and Jackson on the run. Jackson was the last person known to be with the child. The police had unsuccessfully searched the surrounding area for the child and had interviewed family and friends in an attempt to find the boy. Questioning Jackson was the only remaining course of action that reasonably promised results. The police limited their questions to the location of the child. It is fair to conclude that the primary purpose of the questions was to rescue the child,

not to investigate a crime. The trial court did not err in admitting Jackson's custodial statements directing police to the child under these circumstances.

## IV. JURY INSTRUCTIONS

¶ 23 In Proposition III, Jackson challenges both first and second-stage jury instructions, claiming the trial court erred in failing to accurately instruct the jury on all critical features of Oklahoma law.

### First–Stage Instructions

██ ¶ 24 Jackson first claims that the trial court erred when it refused his requested instruction on the lesser-included offense of second-degree depraved mind murder. We review a trial court's decision on the submission of lesser included offense instructions for an abuse of discretion. *Cipriano v. State*, 2001 OK CR 25, ¶ 14, 32 P.3d 869, 873.

 ¶ 25 Jury instructions on lesser forms of homicide should be given if they are reasonably supported by the evidence. *Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036. To determine whether lesser-included offense instructions are warranted, this Court looks at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. *Harris*, 2004 OK CR 1, ¶ 50, 84 P.3d at 750. Jackson contends the trial court necessarily determined that there was evidence to support a finding of "no design to effect death" when it decided the evidence supported a firstdegree manslaughter instruction. Because depraved mind murder also requires no premeditated design to effect death, he contends that the trial court

---

**8.** Under the public safety exception, the motive of the officer is irrelevant while under the rescue doctrine, the officer's motive is decisive.

**9.** Jackson contends that this Court should not adopt the "public safety exception" in light of the Supreme Court's decision that *Miranda* announced a constitutional rule that Congress may not supersede legislatively. *Dickerson v. United States*, 530 U.S. 428, 432, 120 S.Ct. 2326, 2329, 147 L.Ed.2d 405 (2000). He argues the "public safety" exception was created when the Court considered *Miranda* simply a prophylactic rule and that its continued viability is questionable. The *Dickerson* court acknowledged its cases that

created exceptions to *Miranda* (including *Quarles* ) and those that broadened its application stating, "These decisions illustrate the principle—not that *Miranda* is not a constitutional rule—but that no constitutional rule is immutable. No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision." *Id.* at 441, 120 S.Ct. at 2334–35. Contrary to Jackson's claim, the *Dickerson* court reaffirmed the Court's approval of the "public safety" exception.

also should have included this offense for the jury to consider.

¶ 26 To warrant an instruction on depraved mind murder, the evidence must reasonably support the conclusion that the defendant committed an act so imminently dangerous to another person or persons as to evince a state of mind in disregard for human life, but without the intent of taking the life of any particular individual. *Harris*, 2004 OK CR 1, ¶ 49, 84 P.3d at 750; OUJI–CR2d 4–91. According to Jackson, he fought with Decator and the fighting escalated until he could no longer reason with her. He told police that he did not intend to kill Decator and stabbed her so she could not stab him. Jackson did not present any evidence, nor did the State's case provide any, that showed he engaged in imminently dangerous conduct in extreme disregard for human life *without* the intent of taking the life of any particular individual. His defense was one of imperfect self-defense. The evidence thus supported the trial court's decision to give instructions on self-defense and heat of passion manslaughter. The trial court did not err in refusing Jackson's request for second degree murder instructions.

¶ 27 Next Jackson contends the trial court erred when it instructed the jury that it could consider the evidence concerning Jackson's injury to the child to show motive, intent, preparation, plan, absence of mistake, or accident. He argues that this evidence should have been limited solely to "motive" and that the use of the evidence without an appropriately narrow instruction permitted the jury to conclude that he was a criminal who acted in conformity with his character when he killed Decator. The State argues that a limiting instruction was not required because the evidence concerning the injury to the child was part of the *res gestae*.

¶ 28 "Evidence is considered **res gestae** a) when it is so closely connected to the charged offense as to form part of the entire transaction, b) when it is necessary to give the jury a complete understanding of the crime, or c) when it is central to the chain of events." *Rogers v. State*, 1995 OK CR 8, ¶ 21, 890 P.2d 959, 971. Evidence that Jackson injured the child was necessary to give the jury a complete understanding of the crime and was central to the chain of events. It was inextricably entwined with the crime charged. Such evidence does not require a limiting instruction. *Bennett v. State*, 1987 OK CR 208, ¶ 18, 743 P.2d 1096, 1099. For that reason, Jackson cannot show any error resulting from the instruction given. No relief is required.

¶ 29 Jackson claims that the trial court erred in refusing his request to alter the definitional instruction of "malice aforethought" (OUJI–CR2d 4–62) to include a statement that the jury "may not presume the existence of the requisite intent from the fact of slaying alone." He contends that without this addition to the uniform instruction, a danger exists in those cases where the defendant has admitted the homicidal act that the jury will shift the burden of proof to the defendant to disprove that the killing was intentional.

¶ 30 Jury instructions are sufficient if when read as a whole they state the applicable law. *Hogan v. State*, 2006 OK CR 19, ¶ 39, 139 P.3d 907, 923. The trial court gave the uniform instruction defining malice aforethought. It also gave the uniform instruction on the burden of proof, requiring the State to prove all of the elements of first degree murder, including malice aforethought, beyond a reasonable doubt. The fact that Jackson confessed to killing Decator did not relieve the State of its burden to prove that he intended to do so. The instructions given accurately stated the law and the trial court did not err in refusing Jackson's modified instruction.

### Second–Stage Instructions

¶ 31 Jackson argues the jury should have been instructed on the limitations of the Pardon and Parole Board with regard to a sentence of life without the possibility of parole. Jackson concedes that we have previously rejected this argument, but raises the issue in order to prevent a finding of waiver in any subsequent state or federal proceedings. *See Mayes v. State*, 1994 OK CR 44, ¶¶ 135–36, 887 P.2d 1288, 1318. He fails to present

any new argument or authority warranting further discussion. This claim is denied.

¶ 32 Next Jackson contends his rights to due process and to trial by jury were violated by the trial court's failure to instruct the jury that the death penalty could not be imposed unless it found that the aggravating circumstances outweighed the mitigating circumstances "beyond a reasonable doubt." This Court has repeatedly rejected this claim. *Rojem v. State*, 2006 OK CR 7, ¶ 59–60, 130 P.3d 287, 299; *Jones v. State*, 2006 OK CR 5, ¶ 109, 128 P.3d 521, 551; *Torres v. State*, 2002 OK CR 35, ¶ 6, 58 P.3d 214, 216. These cases are controlling here.

 ¶ 33 Jackson argues the uniform instructions pertaining to aggravating circumstances and mitigating evidence given in his case allowed the jury to presume that death was the appropriate punishment if it found that mitigating evidence did not exist. The fundamental problem, he contends, is that the jury was not informed that mitigating circumstances do not have to be found at all in order to impose a sentence less than death. Because jurors had been told during jury selection that a verdict of guilty was not optional if the State proved all the essential elements of a crime, he argues the jury could have believed that the death penalty was required if no mitigating factors were proven. Because he did not object on these grounds below, we review for plain error only. *Mitchell v. State*, 2005 OK CR 15, ¶ 65, 120 P.3d 1196, 1212.

¶ 34 Instructions will be deemed sufficient if taken as a whole they accurately state the applicable law. *Hogan*, 2006 OK CR 19, ¶ 39, 139 P.3d at 923. Misdirection of the jury does not warrant relief unless this Court finds that such error has probably resulted in a miscarriage of justice or constitutes a sub-

stantial violation of a constitutional or statutory right. 20 O.S.2001, § 3001.1.[10]

¶ 35 Jackson's jury was not specifically instructed that it could impose a sentence less than death even if it did not find any mitigating circumstances. There is, however, no reason to conclude that the jury was misled by the instructions as Jackson speculates. The court instructed Jackson's jury that it could not impose the death penalty unless it found the existence of at least one aggravating circumstance beyond a reasonable doubt and further that the aggravating circumstance found outweighed any mitigating circumstances. The court identified sixteen mitigating circumstances for the jury to consider and told jurors that they could consider any other mitigating circumstance shown by the evidence. The instructions provided that unanimity and proof beyond a reasonable doubt were not required for mitigating evidence. The court also instructed the jury that, even with a finding that aggravators outweigh mitigators, it was free to impose a sentence less than death. These instructions adequately stated the applicable law and did not mislead Jackson's jury or direct that the jury must impose the death penalty if it did not find any mitigating circumstances in the case. No relief is required.

 ¶ 36 Finally, Jackson claims that the trial court erred by refusing to instruct the jury on the "heinous, atrocious, or cruel" aggravating circumstance by using the instruction requested by his counsel. Jackson's proposed instruction incorporated the uniform instruction [OUJI–CR(2d) 4–73], but added an additional paragraph further defining "torture" and "serious physical abuse" based upon decisions from this Court.[11] The

10. Section 3001.1 provides:

No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

11. The added paragraph stated:

As used in these instructions, the term "torture" refers to the infliction of either great physical anguish causing conscious physical suffering of the victim, or extreme mental anguish in addition to that which of necessity accompanies the underlying killing. The phrase "serious physical abuse" refers to the infliction of gratuitous violence beyond the act of killing from which the victim consciously suffered.
O.R. 1754.

trial court rejected the proposed instruction, opting instead to use the uniform instruction in affect at the time.[12] Jackson argues the instruction given was insufficient to meet the constitutional requirement that a jury find sentence enhancing facts beyond a reasonable doubt because the jury was not instructed that it must find conscious physical suffering in order to find the "heinous, atrocious, or cruel" aggravating circumstance. He relies, in part, on this Court's decision in *DeRosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156, *cert. denied*, 543 U.S. 1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005), in which we modified and replaced the instruction given in Jackson's case [OUJI–CR(2d) 4–73 (Supp.2005)] with an instruction explicitly requiring the jury to find conscious physical suffering in order to find "serious physical abuse" or torture through "great physical anguish."[13] Jackson's case was tried before *DeRosa* was handed down.

¶ 37 This Court recently published a case that forecloses Jackson's position. *See Rojem*, 2006 OK CR 7, ¶ 68–72, 130 P.3d at 300–01. Rojem challenged the uniform instruction, the same one given in Jackson's case, on the basis that it failed to inform jurors "of the requirement of finding inordinate conscious physical suffering." Rojem argued that the former version of the uniform instruction was inadequate because of the new instruction adopted by the Court in *DeRosa* and references therein to *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We disagreed and stated:

12. OUJI–CR(2d) 4–73 (2000 Supp.) provided:

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

13. The new version of OUJI–CR(2d) 4–73 promulgated in *DeRosa* provides:

The State has alleged that the murder was "especially heinous, atrocious, or cruel". This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:

First, that the murder was preceded by either torture of the victim or serious physical abuse of the victim; and

There is no doubt the amended instruction is an improvement over the former and takes a cautious approach toward the concerns addressed in *Ring*. As Appellant notes, the instruction is "intended to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings." *DeRosa*, 2004 OK CR 19, ¶ 96, 89 P.3d at 1156. That is, the instruction *more fully* informs and acts as a form of insurance.

But this does not mean the former instruction has suddenly become unconstitutional. Indeed, *DeRosa* plainly states it "should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate ... Hence cases in which the former instruction has been used and applied are not subject to reversal on this basis." Id., 2004 OK CR 19, ¶ 97, 89 P.3d 1124, 1155.

*Rojem*, 2006 OK CR 7, ¶¶ 70–71, 130 P.3d at 301. *Rojem* is dispositive and we reject this claim.

¶ 38 Jackson also argues that denying him the benefits of a "now-cured" instruction violates his constitutional right to equal protection of the law because he is being treated differently from those defendants tried post *DeRosa*. On the contrary, the *DeRosa* court made clear that the former version and the modified version of OUJI–CR(2d) 4–73 were

Second, that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel.

You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his/her death.

In addition, you are instructed that the term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.

both constitutionally sufficient. *DeRosa*, 2004 OK CR 19, ¶ 97, 89 P.3d 1124, 1155. In *Rojem*, we cited numerous cases in which we had found an instruction, like the one used in this case, sufficient to narrow the "especially heinous, atrocious, or cruel" aggravator and pass constitutional muster. *Rojem*, 2006 OK CR 7, ¶ 73, 130 P.3d at 301. *DeRosa* did not cure a defective instruction; rather, it improved on an otherwise valid instruction. Jackson cannot show that he has been denied equal protection under these circumstances. This claim is denied.

## V. SECOND STAGE ISSUES

### A.

¶ 39 In Proposition II, Jackson claims the jury's finding that he "knowingly created a great risk of death to more than one person" is not supported by the evidence. He contends that the injuring of the child and the murder of his mother were separate and distinct acts that were not in close proximity to the murder in terms of time, location, or intent because the injuries to the child occurred hours before the murder, the child was not present during the murder and he did not possess the same intent when committing the acts.

¶ 40 The State argued at trial and now on appeal that this aggravator is supported because Jackson acted with the same "murderous intent" when he put the incapacitated child under the vacant house where he would not be found and then murdered his mother so she would not report his abuse of her son. The State also argued at trial that the murder of Decator created a great risk of death to the child because she was the only person likely to find him before he died.

¶ 41 When the sufficiency of the evidence supporting an aggravator is chal-

lenged on appeal, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt. *Harris*, 2004 OK CR 1, ¶ 53, 84 P.3d at 751. "The rationale behind [the great risk of death] aggravator is that, by its very language, there must be a risk of death, that risk must be to more than one person, it must be great, and the defendant must know that risk exists." *Slaughter v. State*, 1997 OK CR 78, ¶ 67, 950 P.2d 839, 858. It is not the death of more than one person that satisfies this aggravator, but the acts of a defendant that create a great risk of death to at least one other person who is in close proximity to the homicide in terms of time, location and intent. *Harris*, 2004 OK CR 1, ¶ 53, 84 P.3d at 751; *Salazar v. State*, 1996 OK CR 25, ¶ 8, 919 P.2d 1120, 1123.

¶ 42 The trial court viewed the incidents with the child and his mother as a continuing transaction. Because the child faced a great risk of dying during the time Jackson murdered Decator, it found that the aggravator was appropriate for the jury to consider. Jackson argues that this reasoning is too broad and is at odds with our case law. He maintains that the aggravator applies only where during the course of a homicide another person is placed at great risk of being killed as well. The focus, he claims, is on the risk created by the homicidal act itself. And, he argues that the aggravator does not apply here because the evidence showed that the child was placed under the house long before he killed Decator.

¶ 43 In the majority of cases in which this aggravator has been upheld, the defendant either killed two or more people contemporaneously with the intent to kill all the victims or contemporaneously injured or killed one or more bystanders in the line of fire.[14]

---

14. *See, e.g., McElmurry v. State*, 2002 OK CR 40, 60 P.3d 4 (defendant murdered husband and wife at the same residence on the same day with the same lethal instruments) *Fluke v. State*, 2000 OK CR 19, 14 P.3d 565 (defendant murdered his wife and two adolescent daughters in their home); *Hooper v. State*, 1997 OK CR 64, 947 P.2d 1090 (defendant murdered his girlfriend and her two children); *Ochoa v. State*, 1998 OK CR 41, 963 P.2d 583 (defendant murdered hus-

band and wife contemporaneously); *Neill v. State*, 1994 OK CR 69, 896 P.2d 537 (defendant killed three people during bank robbery); *McCracken v. State*, 1994 OK CR 68, 887 P.2d 323 (defendant shot four victims during robbery); *Walker v. State*, 1994 OK CR 66, 887 P.2d 301 (defendant stabbed to death his girlfriend and her uncle); *Malone v. State*, 1994 OK CR 43, 876 P.2d 707 (defendant opened fire on homicide victim while two men stood nearby on porch,

*Slaughter*, 1997 OK CR 78, ¶ 68, 950 P.2d at 858; *Salazar v. State*, 1996 OK CR 25, ¶ 9, 919 P.2d at 1123.

¶ 44 The circumstances here are unlike those in any of our prior cases and the opposing parties at oral argument each made persuasive arguments in support of their position. We need not decide the issue in this case, however. We conclude that even were we to find that Jackson's conduct here does not constitute the knowing creation of great risk of death to more than one person, the submission of this aggravator to the jury did not skew the jury's decision to impose the death penalty. The United States Supreme Court recently set forth a test to determine when a death sentence must be set aside if an aggravating circumstance is invalidated. "An invalidated sentencing factor ... will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884, 892, 163 L.Ed.2d 723 (2006). If the jury could have properly considered the evidence used to support the invalidated aggravator anyway because it also supported a separate and valid aggrava-

tor, the death sentence will stand. The Court held that in such a situation the jury has not considered any improper evidence and has not weighed any improper aggravating evidence against the mitigating evidence in arriving at its sentence. *Id.*

¶ 45 The evidence that Jackson injured the child was relevant to support the aggravator that he committed the murder of Decator "to avoid arrest or prosecution." The gravity of the child's injuries, as detailed by the treating physician, showed that Jackson appreciated the seriousness of the child's condition and deliberately murdered the child's mother to avoid being held responsible. Hence, the "great risk of death" aggravator was not supported by any evidence that was not also admissible to support a separate aggravator. Thus even if the "great risk of death" aggravator was improperly applied in the current case, the jury's weighing process of mitigating evidence against aggravating circumstances was not skewed. This claim is rejected.

**B.**

¶ 46 In Proposition IV, Jackson argues the evidence in his case was insufficient to prove beyond a reasonable doubt

---

several people sat inside talking and children played outside); *Snow v. State*, 1994 OK CR 39, 876 P.2d 291 (defendant killed victim in private cubicle and then sought out and attacked second victim in the same location minutes later); *Long v. State*, 1994 OK CR 60, 883 P.2d 167 (defendant simultaneously stabbed to death mother and son); *Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289 (defendant initially shot three people, one fatally and one critically, and at second crime scene, killed two more people and shot two others); *Paxton v. State*, 1993 OK CR 59, 867 P.2d 1309 (defendant shot three people at close range in a small house, fatally injuring one); *Trice v. State*, 1993 OK CR 19, 853 P.2d 203 (defendant raped and bludgeoned to death an elderly woman, and also severely beat her retarded son); *Stafford v. State*, 1992 OK CR 33, 832 P.2d 20 (defendant shot and killed a family of three when they stopped to help him with his car); *Stout v. State*, 1991 OK CR 98, 817 P.2d 737 (defendant killed his sister and her husband); *Sellers v. State*, 1991 OK CR 41, 809 P.2d 676 (defendant killed his parents as they lay sleeping in bed); *Fox v. State*, 1989 OK CR 51, 779 P.2d 562 (defendant murdered three grocery employees in back room of the store); *see also Fowler v. State*,

1989 OK CR 52, 779 P.2d 580 (codefendant's case); *Nguyen v. State*, 1988 OK CR 240, 769 P.2d 167, *overruled in part on other grounds in Green v. State*, 1993 OK CR 30, 862 P.2d 1271 (defendant killed woman and two small children in different rooms of same house); *Stouffer v. State*, 1987 OK CR 92, 738 P.2d 1349 (defendant shot two people, one fatally, in different parts of same house); *Bowen v. State*, 1984 OK CR 105, 715 P.2d 1093 (defendant shot and killed three men as they left party); *Stout v. State*, 1984 OK CR 94, 693 P.2d 617 (defendant beat two people to death); *Robison v. State*, 1984 OK CR 21, 677 P.2d 1080 (defendant murdered three people in the same house); *Dutton v. State*, 1984 OK CR 12, 674 P.2d 1134 (defendant fatally shot one victim during robbery and also shot victim's mother); *Stafford v. State*, 1983 OK CR 86, 665 P.2d 1205 (defendant executed six restaurant workers), *vacated on other grounds in Stafford v. Oklahoma*, 467 U.S. 1212, 104 S.Ct. 2651, 81 L.Ed.2d 359 (1984); *Jones v. State*, 1982 OK CR 112, 648 P.2d 1251 (defendant killed one victim and critically injured two others); *Chaney v. State*, 1980 OK CR 37, 612 P.2d 269 (defendant murdered two women).

that he murdered Decator to avoid arrest or prosecution. We review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support this aggravating circumstance beyond a reasonable doubt. *Harris*, 2004 OK CR 1, ¶ 53, 84 P.3d at 751. To establish the aggravating circumstance that a murder was committed "for the purpose of avoiding or preventing a lawful arrest or prosecution," the State must show that the murder was committed "for the purpose of avoiding arrest or prosecution for a separate, predicate crime, apart from the murder itself." *DeRosa*, 2004 OK CR 19, ¶ 84, 89 P.3d at 1153. The defendant's intent can be proven by circumstantial evidence. *Id.*

¶ 47 The evidence at trial supports the jury's finding that Jackson murdered Decator to avoid arrest for the separate, predicate crime of physically abusing her son. Jackson told police how he injured the child in the morning and early afternoon by beating him and shoving him to the floor. He started preparations to avoid criminal responsibility for injuring the child almost immediately. Before Decator got home from work, he hid the child under the vacant house, purchased gasoline to burn down the duplex, and emptied her bank account so he could leave town. Before he killed Decator, he told his mother that he, Decator and the boy were going to Louisiana. Jackson also told police that he did not call for aid for Decator because she would have reported him for injuring her son. Any rational jury could have found that the evidence presented during Jackson's trial was sufficient to establish the aggravating circumstance that the murder was committed to avoid arrest or prosecution.

### C.

¶ 48 In Proposition VI, Jackson claims he was denied his right to due process and a reliable sentencing proceeding because of erroneous evidentiary rulings by the trial court. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Williams v. State*, 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724.

### 1. Jackson's Statement

¶ 49 Jackson first complains that the trial court erred in admitting the first part of his recorded statement to police (consisting of the first 19 pages of State's Exhibit 54 and the corresponding portion of the videotape) detailing the abuse he inflicted on the child. Evidence is admissible if it is relevant and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Washington v. State*, 1999 OK CR 22, ¶ 25, 989 P.2d 960, 971; 12 O.S. 2001, §§ 2401–2403.

¶ 50 The trial court ruled that this part of Jackson's statement was relevant and not unfairly prejudicial because it helped explain the events leading up to the murder and was necessary for the jury to understand the theories of both the State and the defense. The trial court did not allow the State to present evidence during the first stage about the extent of the child's injuries. The statements made by Jackson about the circumstances of his injuring the child provided evidence of his motive for killing Decator and explained his later actions. This evidence was an integral part of this case and the trial court did not err in admitting the challenged evidence, including the portion relating to the child.

### 2. Crawlspace Photographs

¶ 51 Second, Jackson challenges the admission of photographs and a drawing of the crawlspace where the child was found (State's Exhibits 58–63). This evidence was admitted during the testimony of the former Tulsa police officer who actually located the child underneath the abandoned house. The trial court overruled Jackson's objections challenging the evidence as cumulative and unduly prejudicial, but allowed the admission of only one photograph actually showing the child in this place.

¶ 52 These exhibits were neither unfairly prejudicial nor cumulative. The State's theory was that Jackson intended to kill Decator so that she could not report him for injuring her son. The lengths that Jackson went to in order to hide the boy so no one would find him as demonstrated by these exhibits tend-

ed to support the State's theory that he killed Decator so she could not notify the police and so he could get away. This evidence also refuted Jackson's statement that he wanted the child to be found, casting doubt on the truth of his entire statement.

### 3. Treating Physician's Testimony

 ¶ 53 Next, Jackson contends the admission of the second-stage testimony of the child's treating physician, detailing the child's injuries, was unfairly prejudicial. He maintains that this testimony and other improper victim impact evidence combined to form a punishment phase focused almost entirely on the injured child, resulting in a skewed sentencing proceeding with the child abuse evidence acting as a "superaggravator."

¶ 54 The doctor described the numerous blunt force injuries sustained by the child and the near fatal brain swelling that resulted from the blows. He also described injuries on the child's neck associated with strangulation. As noted above, the doctor's testimony was relevant to prove the "avoid arrest" aggravator. It tended to prove that Jackson would have known and appreciated the seriousness of the child's condition and likely murdered the child's mother so that she could not report him. The probative value of the doctor's testimony was not outweighed by the danger of unfair prejudice and the trial court did not err in admitting it.

### 4. Photographs of the Victim

 ¶ 55 Jackson claims that certain photographs depicting Decator's injuries (State's Exhibits 15–18, 35–38) were unfairly prejudicial. Photographs are admissible if they are relevant and if their probative value is not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. *Lockett v. State*, 2002 OK CR 30, ¶ 19, 53 P.3d 418, 425; 12 O.S. 2001, §§ 2402–2403.

¶ 56 These photographs were probative because they assisted the jury in understanding the medical examiner's testimony and in understanding the State's theory of how the

crime occurred. They also corroborated parts of Jackson's confession. Each of the photographs showed a different aspect or view of the various wounds Decator sustained. Their probative value was not substantially outweighed by the danger of needless presentation of cumulative evidence; nor were the photos unfairly prejudicial. The photos show the victim and the wounds she sustained during her attack. They are not gratuitously shocking and they depict her killer's handiwork. It did not violate due process to show them to Jackson's jury. See *DeRosa*, 2004 OK CR 19, ¶ 73, 89 P.3d at 1150.

### D.

¶ 57 In Proposition VII, Jackson claims his death sentence must be vacated because the evidence in mitigation outweighed the evidence in aggravation. He argues: 1) that the jury's decision was skewed by its consideration of unsupported aggravators ("murder to avoid arrest" and "great risk of death to more than one person"); 2) that these two unsupported aggravators allowed the State to make the trial about the injured child rather than his murdered mother; and 3) that the evidence in support of the "especially heinous, atrocious, or cruel" aggravator was weak in light of his theory that Decator's death was the result of mutual combat.[15]

 ¶ 58 The question of whether aggravating circumstances outweigh mitigating circumstances is for the jury to determine based on the evidence presented. It is not the duty of this Court to substitute its judgment for that of the jury. *Young v. State*, 2000 OK CR 17, ¶ 79, 12 P.3d 20, 42. We review the evidence only to determine whether sufficient evidence was presented from which a rational trier of fact could find the aggravating circumstances outweighed the mitigating circumstances and warranted the sentence of death. *Id.*, at ¶ 80, 12 P.3d at 42–43.

¶ 59 The record shows that sufficient evidence was admitted to prove two of the three

---

15. Jackson does not, however, challenge the sufficiency of the evidence supporting the aggravator that the murder was especially heinous, atrocious, or cruel. We note that Decator had defensive wounds on both hands indicating conscious physical suffering.

aggravating circumstances. Error, if any, in the finding of the "great risk of death to more than one person" aggravator did not skew the jury's weighing process. Jackson presented evidence of sixteen mitigating circumstances that were specifically identified by the court.[16] The jury was properly instructed on imposing punishment. Thus Jackson's conviction and death sentence were not the result of the admission of improper evidence or witness testimony or other trial court error. Nor was the death sentence imposed because of any arbitrary factor, passion or prejudice. The jury heard the evidence and found that the aggravating evidence outweighed the mitigating evidence and reasonably concluded that the death penalty was justified in this case.

### E.

¶ 60 In Proposition VIII, Jackson claims that the victim impact evidence in his case was unfairly prejudicial because it focused almost exclusively on the emotional impact of Decator's murder on her family. He argues that the admission of such victim impact evidence makes it less likely that the jury's sentencing decision was a reasoned, moral response to the question of whether he deserved the death penalty.

¶ 61 Evidence about the victim and about the financial, emotional, psychological, and physical impact of the murder on the victim's family is admissible. 21 O.S.2001, § 701.10(C); 22 O.S.2001, § 984. While victim impact testimony should generally be restricted to these issues, it can also be used to give the jury "a quick glimpse" of the life of the victim, to demonstrate "those unique

characteristics which define the individual who has died," and to show "why the victim should not have been killed." *See, e.g., De-Rosa,* 2004 OK CR 19, ¶ 77, 89 P.3d at 1151; *Cargle v. State,* 1995 OK CR 77, 909 P.2d 806, 828; *see also Payne v. Tennessee,* 501 U.S. 808, 822–25, 111 S.Ct. 2597, 2606–08, 115 L.Ed.2d 720 (1991). The prepared statements read by Decator's sisters and the testimony of Decator's mother contained evidence of the emotional, psychological and physical effects of Decator's death upon these women.[17] The statements were concise and the emotional references to Decator's death and her son did not render the statements unfairly prejudicial or inadmissible. The trial court did not abuse its discretion in allowing this victim impact evidence.

¶ 62 Jackson also argues that victim impact evidence "operates as an irrelevant, improper, nonstatutory, 'super-aggravator' that will always be present in every capital case." This claim has been raised repeatedly and rejected. *DeRosa,* 2004 OK CR 19, ¶ 83, 89 P.3d at 1152–53. We need not reexamine the issue here, especially since Jackson's jury was properly instructed on the proper and limited role of victim impact evidence. These claims are denied.

### F.

¶ 63 In Proposition IX, Jackson argues that the three aggravating circumstances found by the jury are unconstitutionally vague, that the limitations placed on these aggravators by this Court are not consistently applied and that his jury was not fully and accurately informed of these limitations.

---

**16.** The mitigating evidence presented by Jackson included that he was born to a 15–year–old alcoholic; that he had no relationship with his father until adulthood; that he was raised by a physically, verbally, and emotionally abusive step-father; that he exhibited signs of no self-worth and acted out in hopes of being removed from his home environment; that he witnessed continual domestic violence between his mother, step-father, and sisters; that he was placed in a secure juvenile facility after committing only property crimes because of his cultural environment; that he suffered brutal treatment from other inmates at the boys' prison; that his family abandoned him during his stay at the boys' prison causing him to stay additional time because the family

failed to notify the facility of their relocation; that he lacked a significant criminal history; that he suffered from emotional and psychological problems as an adolescent that prevented him from acquiring necessary social skills and maturity; that he suffers from brain damage as a result of fetal alcohol syndrome; that he has shown a potential for contributing affirmatively to the lives of friends, other inmates, and prison staff; and that he is already serving a life sentence for injuring Decator's son and a 35–year sentence for setting fire to the home.

**17.** The testimony of Decator's mother from Jackson's first trial was read into the record because she was unavailable.

This Court has upheld the constitutionality of each of these aggravators as defined and applied. *See DeRosa,* 2004 OK CR 19, ¶ 90, 89 P.3d at 1154 (upholding "avoid arrest" aggravator); *Matthews v. State,* 2002 OK CR 16, ¶ 47, 45 P.3d 907, 922 (upholding "great risk of death" aggravator); *Black v. State,* 2001 OK CR 5, ¶ 78, 21 P.3d 1047, 1073–74 (upholding "heinous, atrocious, or cruel" aggravator). Jackson's claim that the uniform instructions given in his case failed to fully define and advise the jury of the facts related to the "heinous, atrocious, or cruel" aggravator has already been addressed and rejected. Jackson offers no persuasive reason to revisit these issues. This proposition is denied.

## VI. CUMULATIVE ERROR

¶ 64 In Proposition X, Jackson claims that even if no individual error in his case merits reversal, the cumulative effect of the errors committed during his retrial necessitates reversal of his murder conviction or modification of his death sentence. This Court has recognized that when there are "numerous irregularities during the course of [a] trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *DeRosa,* 2004 OK CR 19, ¶ 100, 89 P.3d at 1157 (*quoting Lewis v. State,* 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176). We have reviewed Jackson's claims of error and the record in this case and conclude that, although his trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his trial fundamentally unfair, taint the jury's verdict, or make his sentence unreliable.

## VII. MANDATORY SENTENCE REVIEW

¶ 65 Title 21 O.S.2001, § 701.13 requires this Court to determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance. After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 66 A review of the record in this case in conjunction with Jackson's claims for relief reveals that Jackson's conviction and death sentence were not the result of trial court error, improper evidence, or witness testimony. Jackson's death sentence was not imposed because of any arbitrary factor, passion, or prejudice. The jury's finding of two aggravators is factually substantiated. The Judgment and Sentence of the trial court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J., C. JOHNSON and LEWIS, JJ.: concur.

LUMPKIN, V.P.J.: concurs in results.

LUMPKIN, Vice–Presiding Judge: Concurs in Results.

¶ 1 I concur in the Court's decision to affirm the judgment and sentence in this case. However, as referenced in Proposition V by Appellant, I continue to believe the law dictates that material placed in s is mere *dicta* and cannot be a holding of the Court. *See Cannon v. State,* 1995 OK CR 45, 904 P.2d 89, 108 (Lumpkin, J., Concurring in Result) (*citing Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985)). In this case I recognize the stylistic error in the previous opinion, but recognize at the same time that decision was a holding of the Court. Confusion on these issues can be extinguished by properly placing the holding of the Court in the body of the opinion, where it belongs.

¶ 2 Further, I am pleased to see the Court recognized in Proposition V that under the label of "*de novo* review," the Court is bound by the facts already adjudicated in the case, and must apply the correct legal standard of review to those facts.

¶ 3 As it relates to the issue raised in Proposition II, concerning the scope of the

"great risk of death to more than one person" aggravator, I believe the application of that aggravator will always be determined by the facts in each individual case. In that regard, I believe the facts in this case fully support the aggravator, and the Court should not sidestep the issue of expanding the analysis to validate the aggravator as to this Appellant.